Filed 2/5/18 (unmodified opn. attached)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| ALAMEDA COUNTY DEPUTY SHERIFF'S ASSOCIATION et al.,<br><br>    Plaintiffs and Appellants,<br><br>v.<br><br>ALAMEDA COUNTY EMPLOYEES' RETIREMENT ASSN. AND BD. OF THE ALAMEDA COUNTY EMPLOYEES' RETIREMENT ASSN. et al.,<br><br>    Defendants and Respondents;<br><br>SERVICE EMPLOYEES INTERNATIONAL UNION, LOCAL 1021 et al.,<br><br>    Interveners;<br><br>BUILDING TRADES COUNCIL OF ALAMEDA COUNTY et al.,<br><br>    Interveners and Appellants. | A141913<br><br>(Contra Costa County Super. Ct. No. MSN12-1870)<br><br> ORDER MODIFYING OPINION [NO CHANGE IN JUDGMENT] |

It is ordered that the opinion filed January 8, 2018, be modified as follows:

1.  The last line on the first page of the opinion is amended to read "Public Employee Pension Reform Act of 2013 and related legislation (interchangeably, PEPRA, the Pension Reform Act, or AB 197) in an".

1

2. In footnote 5 on page 10 of the opinion and footnote 9 on page 16 of the opinion the words "were employed" are replaced by the words "became members."

3. Footnote 7 is moved to immediately after footnote 6 on page 12 of the opinion, such that the last line of the first paragraph of section "B." is amended read: "seq.; Stats. 2012, ch. 296.)[6][7]"

4. Footnote 7 is amended to read as follows:

   "At the same time the Legislature passed AB 340, it also enacted Assembly Bill 197 (AB 197), with the declared purpose to exclude from CERL's definition of compensation earnable " 'any compensation determined by the [county retirement] board to have been paid to enhance a member's retirement benefit.' " (*Marin*, *supra*, 2 Cal.App.5th at p. 683, fn. omitted.) For purposes of our analysis, we see no material difference between the versions of section 31461 codified by AB 340 and AB 197. (See *Marin*, *supra*, 2 Cal.App.5th at p. 684, fn. 5 [noting that AB 197 adds subdivision (c) to section 31461]; see also footnote 17, *post* [finding AB 197's addition of "payable" to the concept of "earned" in subdivision (b) to be of little significance in this litigation].) For purposes of our opinion, we will follow the custom of referring to both legislative enactments as AB 197, and—as stated above—that designation, along with the Pension Reform Act and PEPRA, will all be used interchangeably."

5. The spelling of "pre-PERPA" is corrected to "pre-PEPRA" on page 18 (six lines from the bottom of the page) and page 45 (three lines from the bottom of the page).

6. On page 61 (three lines from the bottom of the page) the spelling of "AECRA" and "MECRA" are corrected to "ACERA" and "MCERA," respectively.

There is no change in the judgment.

_____

REARDON, J.

We concur:


_____

RUVOLO, P. J.


_____

RIVERA, J.*

*Retired Associate Justice of the Court of Appeal, First Appellate District, Division Four, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

A141913 Alameda County Deputy Sheriff's Assn. v. Alameda County Employees Retirement Assn. modification

Trial Court:                         Contra Costa County Superior Court

Trial Judge:                        Hon. David B. Flinn

Counsel for Appellant:        Isaac S. Stevens
Mastagni, Holstedt, Amick, Miller & Associates

Timothy K. Talbot
Rockne A. Lucia
Rains, Lucia & Willinson

W. David Holsberry
McCracken, Stemerman & Holsberry

Counsel for Respondent:      Harvey L. Leiderman
Reed Smith

Rei Onishi

Ashley K. Dunning
Nossaman

Robert L. Gaumer
Alameda City Employees' Retirement Association

Counsel for Intervenor:       Anne I. Yen
Vincent A. Harrington, Jr.
Kerianne Steele
Weinberg, Roger & Rosenfeld

Peter W. Saltzman
Leonard Carder LLP

Vishtasp Soroushian
Andrew H. Baker
Teague P. Paterson
Beeson, Tayer & Bodine

Robert Bonsall
Beeson, Tayer, Silbert & Bodine

Katwyn T. DeLaRosa
Bennett & Sharpe, Inc.

William I. Corman
Bogatin, Corman & Gold

Christopher E. Platten
Wylie, McBride, Platten & Renner

Paul Q. Goyette
Goyette &Associates

Arthur W. Liou
Leonard Carder

Robert J. Bezemek

Wright Lassiter, III

Mark Friedman

Brian E. Washington

Michael E. Kyle
Randick, O'Dea & Tooliatos

Rod A. Attebery
Neumiller & Beardslee

Richard D. PioRoda
Kenton Alm
Meyers, Nave, Riback, Silver & Wilson

Linda M. Ross
Renne Sloan Holtzman Sakai

James D. Maynard
Maynard Law

5

David J. Larsen
Silver & Wright

Thomas L. Geiger
Contra Costa County Counsel

Lyle R. Nishimi
Judicial Council of California

Marie D. Hanson
Hanson Bridgett

Barbara Fee

Carl P. Nelson
Bold, Polisner, Maddow, Nelson & Judson

Robert Leete

William D. Ross

Craig Downs

Martin T. Snyder
Snyder, Cornelius & Hunter

Sue Casey

Barry J. Bennett
Bennett, Sharpe, Delarosa, Bennett & Licalsi

|  |  |
|---|---|
| Counsel for Intervenor and Respondent | Anthony P. O'Brien Office of the Attorney General |

A141913 *Alameda County Deputy Sheriff's Assn. v. Alameda County Employees Retirement Assn.* Modification

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| ALAMEDA COUNTY DEPUTY SHERIFF'S ASSOCIATION et al.,<br><br>　　Plaintiffs and Appellants,<br><br>v.<br><br>ALAMEDA COUNTY EMPLOYEES' RETIREMENT ASSN. AND BD. OF THE ALAMEDA COUNTY EMPLOYEES' RETIREMENT ASSN. et al.,<br><br>　　Defendants and Respondents;<br><br>SERVICE EMPLOYEES INTERNATIONAL UNION, LOCAL 1021 et al.,<br><br>　　Interveners;<br><br>BUILDING TRADES COUNCIL OF ALAMEDA COUNTY et al.,<br><br>　　Interveners and Appellants. | A141913<br><br>(Contra Costa County Super. Ct. No. MSN12-1870) |

　　This consolidated action arises out of the tension between two undeniably valid, and yet fundamentally opposed, public interests: the interest of the government in maintaining the flexibility to alter statutes to conform to current needs and the interest of public employees in a stable and predictable pension, earned through years of public service. On September 12, 2012, Governor Brown—faced with a statewide crisis involving the significant underfunding of public pension systems—signed into law the Public Employee Pension Reform Act of 2013 (PEPRA or the Pension Reform Act) in an

1

attempt to curb what were seen as pervasive abuses in public pension systems throughout California, including those governed by the County Employees Retirement Law of 1937 (CERL), Gov. Code, § 31450 et seq.[1] (§ 7522 et seq.; Stats. 2012, chs. 296 & 297; see *Marin Assn. of Public Employees v. Marin County Employees' Retirement Assn.* (2016) 2 Cal.App.5th 674, 680-683 (*Marin*), review granted Nov. 22, 2016, S237460.) Various public employees and public employee organizations in Alameda, Contra Costa, and Merced Counties (collectively, the Three Counties) subsequently challenged the constitutionality of PEPRA as it applied to certain CERL plan members who were hired prior to PEPRA's effective date (legacy members). We conclude that the trial court's detailed analysis of PEPRA's effects on the pensions of legacy members was incorrect in certain respects and also improperly failed to include a necessary vested rights analysis. We therefore affirm in part, reverse in part, and remand this matter for further proceedings in accordance with this opinion.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. *Some History of CERL and Section 31461*

The Three Counties are among the 20 counties that maintain employee retirement plans under CERL. (See *Irvin v. Contra Costa County Employees' Retirement Assn.* (2017) 13 Cal.App.5th 162, 169 & fn. 6 (*Irvin*).)[2] Each county plan is administered by its own retirement board, which is tasked with the management of the retirement system. (§ 31520.) The total pensionable costs of each county system are intended by CERL to be actuarially accounted for in advance and funded by employer and employee contributions, as well as returns on investment. (See, e.g., §§ 31453-31454.6, 31520.2; see also *In re Retirement Cases* (2003) 110 Cal.App.4th 426, 438-439 [CERL mandates that "the funds for the pensions contain both employer and employee contributions and

---

[1] Statutory references are to the Government Code unless otherwise indicated.

[2] The remaining 38 counties operate independent retirement systems or contract with the state system—the California Public Employees' Retirement System (PERS)—which is governed by the Public Employees' Retirement Law (PERL), § 20000 et seq. (See *Irvin*, *supra*, 13 Cal.App.5th at p. 169 & fn. 6.)

that the level of funding be based on actuarial valuations"]; *id*. at pp. 461-462 [discussing importance of investment income to system].) Thus, "[u]nder CERL an employee's pension is a combination of a retirement annuity based on the employee's accumulated contributions supplemented by a pension established with county contributions sufficient to equal a specified fraction of the employee's 'final compensation.' " (*Ventura County Deputy Sheriffs' Assn. v. Board of Retirement* (1997) 16 Cal.4th 483, 490 (*Ventura*).)

In order to calculate the specific amount of employee pensions under CERL, the administering retirement board is " 'required to determine whether items of remuneration paid to employees qualify as "compensation" under section 31460 and "compensation earnable" pursuant to section 31461, and therefore must be included as part of a retiring employee's "final compensation" (§ 31462 or § 31462.1).' " (*Marin*, *supra*, 2 Cal.App.5th at p. 680.) Since the definitions contained in these statutes are central to the proper administration of any CERL system and crucial to the resolution of the many issues we here consider, we set them out in detail.

Section 31460 defines " 'compensation' " as "the remuneration paid in cash out of county or district funds, plus any amount deducted from a member's wages for participation in a deferred compensation plan . . . , but does not include the monetary value of board, lodging, fuel, laundry, or other advantages furnished to a member."[3] Under the pre-PEPRA version of section 31461, " 'compensation earnable' " for a CERL member "means the average compensation as determined by the board, for the period under consideration upon the basis of the average number of days ordinarily worked by persons in the same grade or class of positions during the period, and at the same rate of pay." (§ 31461, subd. (a).) In making this calculation, "[t]he computation for any absence shall be based on the compensation of the position held by the member at the beginning of the absence." (*Ibid.*) Moreover, "[c]ompensation, as defined in Section

---

[3] For purposes of CERL, " ' "Member" means any person included in the membership of the retirement association' (§ 31470), which in turn 'means an association of all persons who may qualify as annuitants or beneficiaries' under CERL (§ 31474)." (*Marin*, *supra*, 2 Cal.App.5th at p. 683, fn. 4.)

31460, that has been deferred shall be deemed 'compensation earnable' when earned, rather than when paid." (*Ibid*.)

Once a member's "compensation earnable" is established by the retirement board, section 31462 defines " 'final compensation' " as "the average annual compensation earnable by a member during any three years elected by a member at or before the time he or she files an application for retirement, or, if he or she fails to elect, during the three years immediately preceding his or her retirement." (§ 31462, subd. (a).) Section 31462.1 is substantially the same as section 31462, differing only in that it sets the relevant time period as any single year elected by a member. (§ 31462.1, subd. (a)(1).)[4]

  1. *Relevant Statutory Amendments and Judicial Interpretations pre-PEPRA*.

For many years, the most important case interpreting CERL's definition of compensation earnable was *Guelfi v. Marin County Employees' Retirement Assn.* (1983) 145 Cal.App.3d 297 (*Guelfi*), disapproved on various grounds by *Ventura*, *supra*, 16 Cal.4th at pp. 496-505. In that case, two retired police officers argued that their CERL retirement board did not possess the authority to exclude overtime pay, educational incentive pay, and uniform allowances that they had earned during their chosen final compensation periods from its calculation of their final compensation. (*Guelfi, supra,* 145 Cal.App.3d at pp. 299-301.) The *Guelfi* court—Division Two of this District— disagreed. It first concluded, relying largely on a case interpreting PERL, that uniform allowances must be included in the "other advantages furnished to a member" for purposes of section 31460, and therefore did not constitute compensation under CERL. (*Guelfi, supra,* 145 Cal.App.3d at pp. 303-304.) It next held that, while overtime and educational incentive pay did fit the definition of "compensation" for purposes of section 31460, they nevertheless must be excluded from compensation earnable under the

---

[4] These statutes setting a member's final compensation period are no longer operative for any member who is subject to PEPRA "for all or any portion of his or her membership in the county retirement system." (§§ 31462, subd. (b); 31462.1, subd. (b).) Instead, final compensation is calculated based on compensation earned during a period of at least 36 consecutive months. (§ 7522.32, subd. (a).) The application of this statute to legacy members is not addressed by the parties.

4

language of section 31461. (*Guelfi, supra,* 145 Cal.App.3d at pp. 304-307.) Specifically, the *Guelfi* court opined, educational incentive pay did not constitute compensation earnable under CERL because not all employees in the same grade or class of position qualified for this pay as mandated by section 31461. (*Guelfi, supra,* 145 Cal.App.3d at pp. 303-306.) Similarly, the appellate court concluded that, given the express language of section 31461, compensation earnable must be based on the "number of days 'ordinarily' worked by others of the same rank," thereby necessarily excluding extra hours worked as overtime. (*Guelfi, supra,* 145 Cal.App.3d at pp. 306-307.)

With the *Guelfi* decision as a backdrop, the Legislature enacted several statutes in the early 1990s that impacted CERL's definitions of compensation and compensation earnable. First, in 1990, the Legislature added section 31460.1 to CERL, which provided that " '[c]ompensation' shall not include employer payments, including cash payments, made to, or on behalf of, their employees who have elected to participate in a flexible benefits program, where those payments reflect amounts that exceed their employees' salaries." (Stats. 1990, ch. 142, § 1.) The section was only operative for counties in which the board of supervisors resolved to make it applicable. (*Ibid*.) Shortly, thereafter, however, in 1992, the Legislature repealed this statute, stating that it had been misconstrued by some retirement boards to *require* inclusion of flexible benefits in compensation absent a board of supervisors' election to the contrary. (Stats. 1992, ch. 45, § 3.) In making its decision to repeal section 31460.1, the Legislature cited *Guelfi,* stressed the role of county retirement boards in determining which items of compensation are includable in compensation earnable, and acknowledged the "long-standing practice of the Legislature of not intruding into the county decisionmaking process regarding compensation determinations with respect to those county retirement systems." (Stats. 1992, ch. 45, § 3.)

Next, in 1993, the Legislature made several changes to the definition of compensation earnable applicable only to counties of the first class—i.e., Los Angeles County. (Stats. 1993, ch. 396.) That legislation amended the definition of compensation earnable in section 31461 by including the concept (solely for Los Angeles) that

5

"compensation that has been deferred shall be deemed 'compensation earnable' when earned, rather than when paid." (*Id.*, § 3.) It also added section 31461.1 to CERL, which allowed the Los Angeles County Board of Supervisors, at its election, to exclude from compensation and compensation earnable cafeteria or flexible benefit plan contributions, transportation allowances, car allowances, and/or security allowances. (*Id.*, § 4.; see also § 31461.1, subd. (b).) Section 31461.1 was made applicable only to employees who became members after the effective date of the board of supervisors' resolution opting into the statute. (Stats. 1993, ch. 396, § 4; see also § 31461.1, subd. (c).) Memorandums of understanding executed prior to the effective date of the legislation, as well as retirement board determinations made before that date, were also expressly excluded from the statute's purview. (Stats. 1993, ch. 396, § 4; see also § 31461.1, subds. (e) & (f).) According to the Governor's signing message, this legislation was enacted to allow Los Angeles County to curb pension abuse based on the inclusion of flexible benefits and allowances in pensionable compensation. (Governor's signing message to Assem. on Assem. Bill 1659 (Sept. 7, 1993) Stats. 1993, ch. 396.) Although the Governor urged clean-up legislation to make the exclusion applicable uniformly, this was never done. (*Ibid.*; see § 31461.1.)

Finally, in 1995, the Legislature amended section 31461 to make its statement about deferred compensation applicable to all counties. (Stats. 1995, ch. 558, § 1.) As detailed above, this sentence has remained part of section 31461, and applicable to all counties, up to and through the enactment of PEPRA. According to the legislative history, this change was made to ensure proper funding for deferred benefits under CERL by requiring the funding for that benefit to commence when it is first earned by a member. (Sen. Pub. Employees & Retirement Com., Analysis of Sen. Bill No. 226 (1995-1996 Reg. Sess.), p. 3.)

After these relatively minor legislative tweaks, the CERL pension landscape was dramatically altered in 1997 by the Supreme Court's landmark decision in *Ventura*, *supra*, 16 Cal.4th 483. The *Ventura* court considered a challenge made by a county deputy sheriff's association and three retirees to a county retirement board's decision to

6

exclude from final compensation under CERL various payments made over and above the basic salary paid to all employees in the same job classification, including: county contributions to an employee's deferred compensation plan; bilingual premium pay; a uniform maintenance allowance; educational incentive pay; additional compensation for remaining on-call during meal periods for designated employees; pay in lieu of annual leave accrual; holiday pay; a motorcycle bonus; a longevity incentive; and a field training officer bonus. (*Ventura*, *supra*, 16 Cal.4th at pp. 487-489.) Based on the "language and legislative history of the pertinent CERL provisions," the *Ventura* court first determined that the Legislature did not intend that county contributions to an employee's deferred compensation plan be included in compensation for purposes of CERL. (*Ventura*, *supra*, 16 Cal.4th at p. 487.) In this regard, the high court found dispositive the fact section 31460 only includes in its definition of compensation contributions to a deferred compensation plan that are deducted from a member's wages. (*Ventura*, *supra*, 16 Cal.4th at pp. 494-495.) The Supreme Court, however, went on to conclude that all of the other "disputed premiums" were compensation under CERL, and further held that, "[w]ith the exception of overtime pay, items of 'compensation' paid in cash, even if not earned by all employees in the same grade or class, must be included in the 'compensation earnable' and 'final compensation' on which an employee's pension is based." (*Ventura*, *supra*, 16 Cal.4th at p. 487.) Thus, *Ventura* expressly rejected *Guelfi*'s exclusion of uniform allowances from compensation under CERL as well as its conclusion that compensation must be received by all employees in the same grade or class in order to be included in compensation earnable for pension purposes. (*Ventura*, *supra*, 16 Cal.4th at pp. 495-497, 499-505.)

In *Ventura*, the county had argued that it would face practical problems in adequately funding its retirement system if the Supreme Court departed from the certainty of *Guelfi*'s narrow construction of section 31461. (*Ventura*, *supra*, 16 Cal.4th at p. 507.) Noting that it was not bound by the decision of the lower court in *Guelfi*, however, the *Ventura* court soundly rejected this argument, declaring: "There may be unanticipated costs to Ventura County if the pensions of the individual plaintiffs and the

7

employees the association represents must be recalculated and adjusted upward. If so, to comply with the financial provisions of CERL (§ 31580 et seq.) and accommodate future increases, the county may have to make a supplemental appropriation and adjust the future annual appropriation for its contribution to the pension fund to cover the increase in future retiree pensions that results from inclusion of additional items of 'compensation' in 'compensation earnable.' Past experience should enable the county to anticipate the number of employees who will receive premium pay, however, and adjustments of this nature are contemplated by CERL. (See § 31453, 31454.) *Nothing in this record suggests that the burden on the county fisc justifies either perpetuation of an erroneous construction of the applicable statutes or denying these plaintiffs the benefit of our decision.*" (*Ventura*, *supra*, 16 Cal.4th at p. 507, italics added.)

Because Ventura County was the only county before the Supreme Court, the *Ventura* decision expressly left open the question of whether its holding applied "retroactively to any other county." (*Ventura*, *supra*, 16 Cal.4th at p. 507.) After numerous writ petitions were filed statewide on behalf of CERL member-employees seeking a determination that the retroactive application of *Ventura* was required, the cases were coordinated and the question was squarely addressed and resolved in 2003 by *In re Retirement Cases*, *supra*, 110 Cal.App.4th at pp. 434-435. In short—after considering at length issues of fairness and public policy, the hardships imposed on the parties by retroactivity, the potential impairment of vested contractual rights, and the applicability of federal precedent—Division Two of this District saw no reason not to apply to *Ventura* the settled rule "that 'a decision of a court of supreme jurisdiction overruling a former decision is retrospective in its operation and that the effect is not that the former decision was bad law but that it never was the law.' " (*In re Retirement Cases*, *supra*, 110 Cal.App.4th at pp. 442, 445-468.) The court in *In re Retirement Cases* additionally confirmed that, when dealing with the practicalities of *Ventura*'s retroactive application, retirement boards had the discretion to collect arrears contributions and interest from plan members (even beyond the three-year limitations period), but that they

8

were not required to do so. (*In re Retirement Cases*, *supra*, 110 Cal.App.4th at pp. 469-472.)

In re Retirement Cases is also notable for determining whether three specific types of employee-related payments were required to be included in final compensation under CERL. (*In re Retirement Cases*, *supra*, 110 Cal.App.4th at pp. 472-482.) For instance, as we discuss at length below, the appellate court concluded that cash-outs by employees of unused leave upon retirement (terminal pay), did not constitute pensionable compensation because, under the unambiguous language of CERL, a member's final compensation period may extend up to, but does not include, retirement. (*In re Retirement Cases*, *supra*, 110 Cal.App.4th at pp. 473-476.) The court further held that cash payments made by employers to purchase benefits on behalf of their employees do not qualify as compensation under section 31460, limiting such compensation to cash actually received by the employee. (*In re Retirement Cases*, *supra*, 110 Cal.App.4th at pp. 477-481.) And, it also determined that employer pick-ups of an employee's retirement contributions are not includable in compensation for similar reasons. (*Id.* at pp. 481-482.) Shortly thereafter, in *Salus v. San Diego County Employees Retirement Assn.* (2004) 117 Cal.App.4th 734 (*Salus*), the Fourth District opined, based on the analysis set forth in *In re Retirement Cases*, that certain negotiated sick leave payouts made after retirement were not includable in final compensation. (*Salus*, *supra,* 117 Cal.App.4th at pp. 739-742.)

2.      *Post-Ventura Changes to Compensation Earnable in the Three Counties*.

In the years after *Ventura*, and before the appellate court decisions in *In re Retirement Cases* and *Salus*, CERL counties scrambled to determine how compensation earnable should be calculated to include the many items of premium pay that had previously been excluded from pensionable compensation under a *Guelfi* analysis*,* but were now required to included under *Ventura*'s construction of CERL. "Retirement boards began to include a variety of cash payments in their computations for 'compensation earnable' that they had not included earlier, but they restricted these modified calculations to 'compensation' earned on or after October 1, 1997, the date the

9

Supreme Court declined to rehear *Ventura*." (*In re Retirement Cases*, *supra*, 110 Cal.App.4th at p. 436.) This led to a spate of lawsuits arguing that the *Ventura* holding must be applied retroactively in all CERL counties, litigation which, as stated above, was subsequently coordinated and resolved by *In re Retirement Cases*. (*In re Retirement Cases*, *supra*, 110 Cal.App.4th at pp. 433-434, 436.) However, "[a]t different points in time, before and during the coordinated proceedings, various counties and retirement boards settled with their plan members and/or voluntarily resolved to implement *Ventura* retroactively." (*Id.* at p. 436, fn. 6.) This included all of the Three Counties and their CERL retirement boards (Boards): the Contra Costa Employees' Retirement Association (CCCERA), the Alameda County Employees' Retirement Association (ACERA), and the Merced County Employees' Retirement Association (MCERA).

Thus, for example, in 1999, Contra Costa County, CCCERA, various cities and districts, and representatives of a class of members who retired on or before September 30, 1997, entered into a court-approved settlement agreement pursuant to which compensation earned by all retired and active members prior to September 30, 1997, would be subject to specific agreed upon inclusions in, and exclusions from, compensation earnable. While the settlement was being negotiated, CCCERA had, by resolution in 1998, applied the same inclusions and exclusions to all active members. Compensation items deemed pensionable included on-call pay; the annual sale of vacation leave; and terminal pay, to the extent accrued in the final compensation period. Thereafter, effective for all new members of CCCERA on or after January 1, 2011, new limitations on compensation earnable were adopted. Specifically, pensionable in-service leave cash-outs and terminal pay were limited to amounts that were both earned and cashable in the final compensation period. In addition, any conversion of in-kind benefits to cash during the final compensation period was excluded from pensionable compensation.[5]

---

[5] Given this change, with respect to terminal pay and certain in-kind conversions, legacy members of CCCERA include only those active employees who were employed prior to January 1, 2011.

In a similar fashion, in June 1999, Alameda County, ACERA, representative of active and retired members, and several employee organizations entered into a court-approved settlement agreement establishing "new definitions" of compensation earnable and final compensation in the wake of *Ventura*, applicable to all retired members and all active members whose effective dates of retirement occurred on or after October 1, 1997. Pursuant to the terms of the settlement, compensation earnable was defined as "all items of remuneration paid . . . in cash for services rendered or special skills," including, among other things, "pay premiums that recognize special duties" and "leave paid as salary or as lump sum(s) in lieu of paid leave." However, the definition of final compensation was expressly limited such that "vacation leave and/or sick leave paid as a lump sum shall be recognized as final compensation only to the extent that it is earned during the final compensation period and, in the case of a three-year final compensation period, shall be the annual average of the leave earned."

Finally, MCERA, Merced County, a local district, and several employees—"on behalf of all other individuals who are current, future, retired, or deferred retirement members" of MCERA—entered into a court-approved settlement agreement in June 2000 which, among other things, allowed for the inclusion in compensation earnable of a maximum of 160 hours of terminal pay. For a number of years thereafter, MCERA staff included in compensation earnable both terminal pay up to 160 hours and certain annual in-service leave sell backs occurring during members' final compensation periods. MCERA ultimately repudiated this practice, arguing that its settlement agreement capped all pensionable leave cash-outs at 160 hours, whether cashed out in service or at termination. Litigation ensued, and the trial court concluded that, under the terms of the settlement, up to 160 hours of terminal pay was pensionable *in addition to* any authorized in-service leave sell backs permitted during a member's final compensation period. (*Board of Retirement v. Baker* (Super. Ct. Merced County, 2007, No. 149970) (*Baker*).) While it acknowledged the holding in *Salus*, the court found its construction of the agreement to be consistent with *Ventura* and the intent of the parties at the time of the settlement. (*Baker*, *supra*, Super. Ct. of Merced County, 2007, at pp. 5-6.)

For purposes of this opinion, we refer to all of the settlements described above as Post-*Ventura* Settlement Agreements.

## B.     *The Pension Reform Act (PEPRA)*

After resolution of the many issues involved in applying the *Ventura* holding to CERL pension calculations, pension practices in the Three Counties remained essentially stable for over a decade, as the corresponding CERL Boards determined pensionable compensation in accordance with the Post-*Ventura* Settlement Agreements.  However, during this same timeframe, the unfunded pension liability crisis became increasingly significant at both the state and national level.  (See *Marin, supra,* 2 Cal.App.5th at pp. 680-687.)  In particular, concern focused on so-called pension "spiking"—"attempts by an employee to inflate a component of the retirement formula in order to receive higher retirement benefits over his or her lifetime." (*Mason v. Retirement Board* (2003) 111 Cal.App.4th 1221, 1226 (*Mason*).)  The Legislature responded in 2012 by passing Assembly Bill No. 340 (AB 340), which enacted the Pension Reform Act.  (See § 7522 et seq.; Stats 2012, ch. 296.)[6]

### 1.     *Statutory Changes*.

For purposes of the dispute here at issue, the most important change to CERL effected by the Pension Reform Act was that legislation's amendment of CERL's long-standing definition of compensation earnable.  The Pension Reform Act took the old version of that definition and made it subdivision (a) of section 31461.  It then added a new subdivision (b) to the statute, expressly delineating the many things "compensation

---

[6] We take this opportunity to note that whatever labels have been created—or moral judgments made—with respect to the pension practices at issue in this appeal, they are entirely irrelevant to our determination of the case.  We express no opinion on the judiciousness of the changes to section 31461 made by PEPRA; nor do we judge the wisdom of the statutory structure in place prior to its enactment.  Rather, our sole task at hand is to interpret CERL both before and after the Pension Reform Act to determine whether the challenged benefits were properly includable in compensation earnable under the pre-PEPRA version of section 31461 and whether the Pension Reform Act changed this status quo.

12

earnable" is not. Specifically, according to new subdivision (b) of section 31461, as enacted by PEPRA, " 'compensation earnable' does not include, in any case, the following:

"(1) Any compensation determined by the board to have been paid to enhance a member's retirement benefit under that system. That compensation may include:

"(A) Compensation that had previously been provided in kind to the member by the employer or paid directly by the employer to a third party other than the retirement system for the benefit of the member, and which was converted to and received by the member in the form of a cash payment in the final average salary period.

"(B) Any one-time or ad hoc payment made to a member, but not to all similarly situated members in the member's grade or class.

"(C) Any payment that is made solely due to the termination of the member's employment, but is received by the member while employed, except those payments that do not exceed what is earned and payable in each 12-month period during the final average salary period regardless of when reported or paid.

"(2) Payments for unused vacation, annual leave, personal leave, sick leave, or compensatory time off, however denominated, whether paid in a lump sum or otherwise, in an amount that exceeds that which may be earned and payable in each 12-month period during the final average salary period, regardless of when reported or paid.

"(3) Payments for additional services rendered outside of normal working hours, whether paid in a lump sum or otherwise.

"(4) Payments made at the termination of employment, except those payments that do not exceed what is earned and payable in each 12-month period during the final average salary period, regardless of when reported or paid."[7]

---

[7] At the same time the Legislature passed the Pension Reform Act, it also enacted Assembly Bill 197 (AB 197), with the declared purpose to exclude from CERL's definition of compensation earnable " 'any compensation determined by the [county retirement] board to have been paid to enhance a member's retirement benefit.' " (*Marin*, *supra*, 2 Cal.App.5th at p. 683, fn. omitted.) There is no material difference between the versions of section 31461, subdivision (b), codified by AB 340 and AB 197. (*Marin*,

13

2.    *Implementation by the Boards*.

In the wake of PEPRA, the Boards in the Three Counties all took action to conform their retirement systems to the new law, excluding certain previously included pay items from compensation earnable.  These changes were made not just for new hires—which no party disputes is permissible—but also for employees retiring after PEPRA's January 1, 2013, effective date.  CCCERA, for instance, adopted a new policy excluding from compensation earnable and final compensation—for all members retiring after January 1, 2013—terminal pay that was not both earned and payable during the member's final compensation period.  Additionally excluded were payments for being on call or on standby.

Similarly, ACERA adopted a number of exclusions from compensation earnable, including any vacation or sick leave sold back at termination; on-call and call-back pay; pay for performance benefits; recruitment bonuses and other one-time payments; and various in-lieu payments.  MCERA determined, based on the new law, that terminal pay could only be included in compensation earnable to the extent it was earned and payable during a legacy member's final compensation period.  In addition, MCERA excluded on-call pay from compensation earnable for legacy members.

## C.    *Litigation in the Trial Court*

Disagreeing with the Boards' application of PEPRA's new rules to the calculation of retirement benefits for legacy members, various employee-members of CERL systems and impacted employee associations in each of the Three Counties (petitioners) filed

---

*supra*, 2 Cal.App.5th at p. 684, fn. 5.)  Rather, as our colleagues in Division Two recently noted with respect to revised section 31461, the only difference between the two versions enacted by AB 340 and AB 197 is that AB 197 "also added section 31461, subdivision (c) to codify the caveat noted by the Senate Rules Committee: 'The terms of subdivision (b) are intended to be consistent with and not in conflict with the holdings in *Salus,* [*supra,*] 117 Cal.App.4th 734 and *In re Retirement Cases,* [*supra,*] 110 Cal.App.4th 426.' (Stats. 2012, ch. 297, § 2.)" (*Marin*, *supra*, 2 Cal.App.5th at p. 684, fn. 5.)  For purposes of this opinion, we will follow the custom of referring to both legislative enactments as AB 197, and that designation, along with the Pension Reform Act and PEPRA, will all be used interchangeably.  (Cf. *ibid*.)

writs of mandate challenging the Boards' implementation actions as an unlawful impairment of legacy members' constitutionally protected pension rights. States are prohibited by the United States Constitution from passing a law "impairing the obligation of contracts." (U.S. Const., art. I, § 10.) Article I, section 9 of the California Constitution states a parallel proscription: "A . . . law impairing the obligation of contracts may not be passed." Thus, petitioners specifically alleged that legacy members had acquired a "vested" right to pension benefits based on the pre-PEPRA state of the law, which could not be altered to their detriment without running afoul of both state and federal contract clauses.[8] After numerous parties intervened—including the State to defend the constitutionality of AB 197—the litigation involving the Three Counties was eventually consolidated into this action.

In addressing the many issues raised by the consolidated cases, the trial court decided to handle the litigation in phases. Thus, the court limited the "Phase One" briefing to purely legal issues focused on whether the pay items expressly excluded from compensation earnable by AB 197 were includable under prior CERL law and whether, if not, legacy members could nevertheless obtain a vested right to such inclusion. Given the trial court's conclusions as described in detail below, the litigation never advanced beyond this initial phase.

Rather, after seven hearings held from October 2013 through April 2014, the trial court issued its final statement of decision with respect to the Phase One issues on May 12, 2014 (SOD), resolving the matter. The court identified the overarching question presented in this case as whether legacy members—generally all active employees who

---

[8] A benefit is deemed "vested" when "the employee acquires an irrevocable interest in the benefit. The 'vesting' of retirement benefits must be distinguished from the 'maturing' of those benefits, which occurs after the conditions precedent to the payment of the benefits have taken place or the benefits are otherwise within the control of the employee." (*Retired Employees Assn. of Orange County, Inc. v. County of Orange* (2011) 52 Cal.4th 1171, 1189, fn. 3 (*County of Orange*).)

15

were employed prior to the effective date of AB 197 (January 1, 2013)[9]—have a vested right to have their pensions calculated upon their retirements in accordance with the pre-PEPRA version of section 31461.  After detailing the history of "compensation earnable" under CERL, the specifics of each County's implementation of section 31461, and the procedural posture of the case, the court made legal determinations with respect to three distinct issues.

The trial court first addressed what it dubbed the "timing issue"—whether compensation must have been both *earned* and *payable* in the final compensation period under the pre-PEPRA version of CERL in order to be included in compensation earnable. As stated above, section 31461, as amended by AB 197, currently excludes from compensation earnable all leave cash-outs, whether paid in the final compensation period or at termination, other than those "that do not exceed what is earned and payable in each 12-month period during the final average salary period, regardless of when reported or paid."  (§ 31461, subd. (b)(2) & (4).)  If—as the State asserts and as we discuss further below—leave cash-outs were always so limited, it is difficult to argue that members hoping to include larger leave accruals in compensation earnable possess a vested right to take advantage of what was, in essence, an illegal practice.

The trial court determined that cash-outs of leave that were *not earned* in the final compensation period could not lawfully be included in a calculation of compensation earnable, even before AB 197's express statements to that effect.  Next, relying on *In re Retirement Cases* and *Salus*, the trial court further opined that compensation that is *not payable* in the final compensation period (so-called terminal pay) was also not a proper component of compensation earnable under the pre-PEPRA version of section 31461. However, although it concluded that, even before PEPRA, compensation had to be both earned and payable in a member's final compensation period to be included in compensation earnable, the trial court nevertheless determined that—for certain subsets

---

[9] As noted above, with respect to certain pay items, legacy members of CCCERA include only those active employees who were employed prior to January 1, 2011.

16

of legacy employees in Contra Costa and Merced—principles of equitable estoppel required the relaxation of this rule in the context of both in-service leave cash-outs and terminal pay.

The second legal issue addressed by the trial court involved the effect on CERL of AB 197's amendment excluding from compensation earnable "[p]ayments for additional services rendered outside of normal working hours, whether paid in a lump sum or otherwise." (§ 31461, subd. (b)(3).) This would, of course, exclude overtime pay from any calculation of compensation earnable, a state of affairs that all seem to agree was in existence prior to PEPRA. (*Ventura*, *supra*, 16 Cal.4th at pp. 487, 500, fn. 20; *Guelfi*, *supra*, 145 Cal.App.3d at pp. 306-307.) However, it also calls into question numerous variations of "on-call" or "standby" pay that arguably, under *Ventura*, were properly included in compensation earnable prior to AB 197's amendments. (See *Ventura*, *supra*, 16 Cal.4th at pp. 487-489 & fn. 5.)

With respect to such on-call pay, although the trial court never expressly analyzed the vested rights issue, it appears to have concluded that legacy employees do have a limited vested right to the continued inclusion of certain types of on-call pay in compensation earnable. Specifically, the trial court directed the Boards to continue to include on-call compensation in compensation earnable for legacy members "in those limited circumstances where the pay category was previously included <u>and</u> the amount to be included was both earned and required of the employee during his or her final compensation period."[10] The trial court further limited legacy members' vested rights with respect to this form of compensation to situations "regularly applicable to the class of employees" and not designed "to 'enhance' the pension."

The third change to CERL effected by AB 197 which was considered by the trial court in its SOD was new subsection (b)(1) of section 31461which, as stated above,

---

[10] According to the SOD, the State appeared "prepared to agree" below that, in these limited circumstances, members may have a vested right to the inclusion of such on-call pay in compensation earnable, to the extent earned in the final compensation period. And, indeed, the State does not appear to challenge this holding on appeal.

excludes from compensation earnable "[a]ny compensation determined by the board to have been paid to enhance a member's retirement benefit." According to the trial court, the parties did not dispute that this subsection represents new law for purposes of a vested rights analysis. Rather, petitioners argued that the Boards could not categorically exclude certain one-time payments on this basis without complying with new section 31542, which requires each Board to establish a procedure for determining whether an element of compensation was paid to enhance a member's retirement benefit, including a process for the presentation of contrary evidence by the employer or member. The trial court denied any relief on this basis "without prejudice," concluding it was "pure speculation" to assume that any issues would ever even come up under this general enhancement provision, given the other express exclusions added to CERL by AB 197.

On the same day it filed its SOD, the trial court entered judgments specific to each of the Three Counties (Judgments) and ordered issuance of related writs of mandate to CCCERA, ACERA, and MCERA (Writs). Based on the analysis in the SOD, all three Judgments denied petitioners' request to have new section 31461 declared an unconstitutional impairment of the vested rights of legacy members, except to the extent the revised statute excluded the value of certain types of on-call payments from such legacy members' compensation earnable. The Contra Costa and Merced Judgments further established an "Estoppel Class," the members of which must be allowed to include in their compensation earnable certain leave cash-outs in excess of those permitted by new section 31461. Finally, the Three Judgments all established 60-day "Stay Periods" following the entry of the Judgments during which legacy members who retired would be entitled to have their compensation earnable calculated in accordance with pre-PERPA policies and practices. The Writs then commanded each of CCCERA, ACERA, and MCERA to implement their policies and practices in a manner consistent with their applicable Judgment.

Notices of Appeal were subsequently filed by a number of the petitioner employee organizations and member-employees representing each of the Three Counties. In addition, both the State and the Central Contra Costa County Sanitary District (Sanitary

18

District) filed their own notices of appeal and cross-appeal. After briefing by these litigants—as well as by CCCERA, ACERA, and MCERA—numerous challenges to the trial court's decision below are now before us for resolution.

## II. DISCUSSION

### A. *Standards of Review and Board Discretion*

1. *Standards of Review*.

As a general matter, the many issues presented in this appeal involve questions of law subject to our de novo review. (*Ghirardo v. Antonioli* (1994) 8 Cal.4th 791, 799 [when "decisive facts" are not disputed, an appellate court is confronted with a question of law]; *Mason*, *supra*, 111 Cal.App.4th at p. 1227 [issues of statutory interpretation subject to de novo review]; see also *Redevelopment Agency v. County of Los Angeles* (1999) 75 Cal.App.4th 68, 74 [questions of constitutional and statutory construction subject to de novo review, " 'independent of the trial court's ruling or reasoning' "].) This is true even though we are reviewing the trial court's ruling on a writ of mandate under Code of Civil Procedure section 1085. Under such circumstances, " 'the appellate court is ordinarily confined to an inquiry as to whether the findings and judgment of the trial court are supported by substantial, credible and competent evidence. This limitation, however, does not apply to resolution of questions of law where the facts are undisputed. In such cases, as in other instances involving matters of law, the appellate court is not bound by the trial court's decision, but may make its own determination.' " (*Pacific Gas & Electric Co. v. Department of Water Resources* (2003) 112 Cal.App.4th 477, 491; see also *Salus*, *supra*, 117 Cal.App.4th at p. 738.)

When construing statutes on appeal, our function " 'is simply to ascertain and declare what is in terms or in substance contained therein, not to insert what has been omitted, or to omit what has been inserted; and where there are several provisions or particulars, such a construction is, if possible, to be adopted as will give effect to all.' " (*Ventura*, *supra*, 16 Cal.4th at p. 492.) Where the language of a statute is ambiguous—as *Ventura* declared sections 31460 and 31461 to be in many respects—our "primary responsibility" when engaging in judicial construction "is to carry out the intent of the

19

Legislature to the extent possible." (*Id.* at p. 493.) In addition—since the task of statutory interpretation here at hand involves the pension rights of legacy members of CCCERA, ACERA, and MCERA—we must keep in mind that " ' "[p]ension legislation must be liberally construed and applied to the end that the beneficent results of such legislation may be achieved." ' " (*Irvin*, *supra*, 13 Cal.App.5th at p. 170.) Thus, while our judicial construction "must be consistent with the clear language and purpose of the statute," it is also true that "[a]ny ambiguity or uncertainty in the meaning of pension legislation must be resolved in favor of the pensioner." (*Ventura*, *supra*, 16 Cal.4th at p. 490.)

On the other hand, since appellants here claim that the application of AB 197 to the calculation of their retirement benefits violates their vested contractual rights under both state and federal contract clauses, they have the burden of " 'mak[ing] out a clear case' " that such a constitutional violation has occurred. (*Deputy Sheriffs' Assn. of San Diego County v. County of San Diego* (2015) 233 Cal.App.4th 573, 578 (*San Diego Deputy Sheriffs*).) Moreover, as the State points out, there is also a presumption at play in these proceedings that the amendments to section 31461 effected by AB 197 are constitutional: " ' "If there is any doubt as to the Legislature's power to act in any given case, the doubt should be resolved in favor of the Legislature's action. Such restrictions and limitations [imposed by the Constitution] are to be construed strictly, and are not to be extended to include matters not covered by the language used." ' " (*California Redevelopment Assn. v. Matosantos* (2011) 53 Cal.4th 231, 253.)

2. *Board Discretion.*

As an additional matter, we cannot ignore the fact that the pension determinations here at issue are the result of the implementation of CERL by the Boards, who have been vested with the authority to manage each of their respective pensions systems. (§ 31520; see also Cal. Const., art XVI, § 17 ["the retirement board of a public pension or retirement system shall have . . . sole and exclusive responsibility to administer the system in a manner that will assure prompt delivery of benefits and related services to the participants and their beneficiaries"].) Both CCCERA and ACERA assert on appeal that

20

it is their responsibility to determine which items of compensation are pensionable under CERL; that they are entitled to judicial deference with respect to their interpretation of AB 197; and that the trial court should not have ordered them to change their implementation of the new law without finding that they had abused their discretion in taking the actions that they did. Under these circumstances, they argue, we should conclude that the trial court erred in substituting its interpretation of AB 197 for that of the Boards.

In *Irvin*, this District recently considered at length the extent to which our review of board decisions interpreting CERL should be deferential. (*Irvin*, *supra*, 13 Cal.App.5th at pp. 171-173.) The *Irvin* court began with a discussion of *Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1 (*Yamaha*), in which the Supreme Court "addressed the weight to be given to the interpretation of a state statute by ' "an administrative agency charged with its enforcement and interpretation." ' " (*Irvin*, *supra*, 13 Cal.App.5th at p. 171, quoting *Yamaha*.) Applying *Yamaha*, the *Irvin* court concluded that the CERL board's statutory interpretation in its case was entitled to " 'due consideration,' " but not deference. (*Id.* at p. 172; see also *Lanquist v. Ventura County Employees' Retirement Assn.* (2015) 235 Cal.App.4th 186, 192-193 (*Lanquist*) [finding by Second District that a county retirement board's interpretation of a CERL provision is entitled to "due consideration"].)

Importantly, the *Irvin* Court went on to note that "it is not entirely clear that *Yamaha* applies at all. That decision was concerned with interpretive annotations in a business tax law guide published by the Board of Equalization, a state agency with exclusive regulatory authority over the laws concerned. The [CERL board], in contrast, does not have an exclusive grant of authority; it is but one of 20 county retirement boards, all of which have responsibility for administering CERL within their jurisdictions." (*Irvin*, *supra*, 13 Cal.App.5th at p. 172; see also *Purifoy v. Howell* (2010) 183 Cal.App.4th 166, 182-183 [rejecting use of deference where many local public and private agencies may have inconsistent interpretations]; *California Highway Patrol v. Superior Court* (2006) 135 Cal.App.4th 488, 501 [rejecting argument that the Legislature

21

should be deemed to have approved a particular statutory interpretation applied by some municipalities for many years because, "[w]hile this principle may apply when a state agency is charged with administering a particular statutory scheme, it has dubious application when numerous cities and counties are charged with applying state law"].) Under these circumstances—where deference could lead to inconsistent interpretations among CERL retirement systems—the *Irvin* court found it "unwise" to defer to the statutory interpretation of a single CERL board. (*Irvin*, *supra*, 13 Cal.App.5th at pp. 172-173.) We agree. Indeed, even under *Yamaha*, we would find this issue dispositive, given the fundamental nature of the questions of statutory interpretation here at issue and their importance to ongoing pension administration for all CERL counties. We thus join our colleagues in *Irvin* and *Lanquist* in giving the Board decisions in this case "due consideration," but not deference.

Before we proceed, however, we must also address another issue regarding Board discretion which is fundamental to our resolution of the questions presented in this case—that is, appellants' repeated and strenuous assertion, based on section 31461 and *Guelfi*, that the Boards have broad discretion to include additional pay items in compensation earnable, over and above those that are *required* to be included under the definitional parameters found in CERL. According to section 31461, " '[c]ompensation earnable' by a member means the average compensation *as determined by the board . . .*" (italics added). (§ 31461, subd. (a).) As discussed above, this District considered in *Guelfi* whether overtime, educational incentive pay, and uniform allowances were required to be included in compensation earnable under section 31461. (*Guelfi*, *supra*, 145 Cal.App.3d 297.) After the *Guelfi* court resolved that they were not, it concluded its opinion by placing the following admonition in its now-famous footnote six: "Nothing in this opinion should be taken as barring either the inclusion of uniform allowance, educational incentive pay and overtime in the calculation of benefits should the Board decide to do so, or the right of a retired member to continue to receive benefits according to such calculation once established. Our conclusion is only that *CERL does not require* inclusion of those items of remuneration for retirees." (*Id.* at pp. 303-307 & fn. 6, italics

22

added.)  Thus began the argument that has informed the CERL pension debate over the last 30 years—that section 31461 merely identifies the *minimum* pay items that must be included in compensation earnable, but does not otherwise limit the discretion of CERL boards to include additional pay items in the calculation of pension benefits if, in their discretion, they choose to do so.

Admittedly, no case or legislative action since *Guelfi* has expressly debunked this notion.  And, indeed, through its language, the Legislature has, at times, encouraged it.  Thus, for instance, when the Legislature repealed section 31460.1 in 1992, as discussed above, it noted that, since its enactment in 1937, CERL has "conferred upon the county retirement boards the duty and power to determine which of the items of compensation paid to county employees who are members of the county retirement associations or systems would constitute 'compensation earnable,' which, in turn, generally determines the amounts of the retirement allowances of retiring members."  (Stats. 1992, ch. 45, § 3.)  In making this statement, the Legislature expressly cited to specific sections of *Guelfi*, including footnote 6.  (*Ibid.*)  Thus, this Legislative action could certainly be viewed as an endorsement of the type of *Guelfi* discretion advocated by appellants.

Several years later, in 1997, the *Ventura* court further muddied the waters with respect to the possible existence of *Guelfi* discretion.  In summarizing *Guelfi's* analysis and holdings regarding the benefits at issue in that case, *Ventura* expressly referenced the statement in footnote six that "[t]he retirement board was free to include those benefits in its retirement calculation if it elected to do so, but CERL did not require that they be included." (*Ventura*, *supra*, 16 Cal.4th at p. 492.)  The *Ventura* court then went on to reject the bulk of *Guelfi's* analysis with respect to the three benefits *Guelfi* considered (overtime, uniform allowances, and educational incentive pay), especially the appellate court's general conclusion that "an item of compensation must be received by all employees in the applicable grade or class of position if it is to be part of a retiring employee's 'compensation earnable.' " (*Ventura*, *supra*, 16 Cal.4th at pp. 499-505, 500.)  In resolving the case before it, however, the *Ventura* court did not directly address the continuing validity or import of *Guelfi's* footnote six.  Rather, it stated only that "the

23

premiums in dispute are 'compensation earnable' within the meaning of [section 31461] and must be included when [plaintiffs'] pensions are calculated. To the extent that *Guelfi* is inconsistent with this conclusion, it is disapproved." (*Ventura*, *supra*, 16 Cal.4th at p. 505.) Arguably, then, *Ventura* could be read as leaving in place *Guelfi's* conclusion that section 31461 merely establishes a floor with respect to which items of compensation must be included in compensation earnable, but does not impose a ceiling on the pay items a CERL board may, in its discretion, deem pensionable.[11]

Subsequent appellate court decisions construing section 31461—*In re Retirement Cases* and *Salus*—also did nothing to dispel the idea that CERL boards have the ability to include otherwise excludable pay items in compensation earnable "should [they] decide to do so." (*Guelfi*, *supra*, 145 Cal.App.3d at p. 307, fn. 6.) *In re Retirement Cases*, for example, clearly recognized the issue, but declined to address it. Ultimately, the appellate court in that case held that disputed pay items at issue were not required under CERL to be included in the calculation of pension benefits. (*In re Retirement Cases*, *supra*, 110 Cal.App.4th at pp. 476, 481-482.) However, the court clarified its holding by stating: "Because we are considering what must be included under the statute and we conclude that the items requested by plan members *do not have to be included* under CERL, we need not consider L.A. County's argument that these items *cannot be included* . . . ." (*Id.* at p. 472, fn. 20, italics added.) Further, while *Salus* was clear that certain sick leave cash-outs payable upon retirement "were not final compensation under CERL," it also phrased its holding in terms of what was not mandated rather than what was prohibited, stating: "Because the sick leave payments were not final compensation, [the county retirement association] was *not required* to include the sick leave payments in calculating appellants' retirement benefits." (*Salus*, *supra*, 117 Cal.App.4th at p. 736,

---

[11] Of course, *Ventura* could as easily be understood as an affirmation of the principal that the statutory language of CERL alone governs which items of compensation may be deemed compensation earnable for pension purposes. (See, e.g., *Ventura*, *supra*, 16 Cal.4th at p. 490 [citing section 31455 in support of the proposition that it is CERL's definitions which "govern construction of CERL"].)

24

italics added.)  Finally, although our Division Two recently touched on the concept of CERL board discretion in *Marin*, *supra*, 2 Cal.App.5th 674, 705, fn. 22, it focused largely on post-PEPRA law and did not directly address *Guelfi*.  In sum, no court has yet definitively laid to rest the argument for expanded *Guelfi* discretion embraced by appellants in this case.  We therefore take this opportunity to do so.[12]

Initially, we point out that the language in footnote six of *Guelfi* was completely unnecessary to the resolution of the issues in that case, and is therefore nonbinding.  (*San Diego Deputy Sheriffs*, *supra*, 233 Cal.App.4th at p. 580 [" '[i]ncidental statements of conclusions not necessary to the decision are not to be regarded as authority' "].)  Indeed, the statement is not even a legal conclusion or an opinion, but is instead merely a clarification of the issues that the court was *not* deciding.  More fundamentally, however, we reject the idea of *Guelfi* discretion, because, quite simply, it makes no sense given the plain language of CERL.

As *Guelfi* itself acknowledged, CERL "set[s] out a clear sequence for computing retirement benefits, beginning with a fairly broad definition of 'compensation' (§ 31460) and progressing through the narrowing definition of 'compensation earnable' (§ 31461) to arrive at 'final compensation' (§ 31564.1)." (*Guelfi*, *supra*, 145 Cal.App.3d at p. 303.)  Thus, the language of CERL does not suggest a statutory structure setting forth a threshold for compensation earnable, while allowing additions at the discretion of the board beyond those required minimums.  Instead, it prescribes a required series of definitional hurdles, all of which must be cleared in order to make a particular pay item pensionable.  Thus, for instance, if footnote 6 is interpreted as appellants suggest, the uniform allowance *Guelfi* held was not compensation (a legal conclusion later reversed by *Ventura*) would nevertheless be pensionable at the discretion of the CERL boards.  (*Guelfi*, *supra*, 145 Cal.App.3d at pp. 303-304; *Ventura*, *supra*, 16 Cal.4th at pp. 495-

---

[12] We note that the trial court below did reject appellants' claim, concluding that the language of section 31461 was not "intended by the Legislature to give each board carte blanche authority to add whatever items it wished to the calculation.  By ordinary meaning the Legislature simply directed each board to make the mathematical or related determination of 'average' compensation."

497.) Yet section 31461 defines compensation earnable as "the average *compensation* as determined by the board, for the period under consideration . . . ." (§ 31461, subd. (a), italics added.) Thus, under the plain language of CERL, a pay item *must* be compensation in order to qualify as compensation earnable. Indeed, *Guelfi*, itself, acknowledges as much. (*Guelfi, supra,* 145 Cal.App.3d at p. 303 ["[u]nder the statutory framework, only items of 'compensation' as defined in section 31460 are to be considered in the Board's determination of 'compensation earnable' "].)

Similarly, the inclusion of overtime in compensation earnable, as suggested by *Guelfi*'s footnote six, would, as all parties seem to agree, run afoul of the express language of section 31461, which bases compensation earnable off of "the average number of days ordinarily worked by persons in the same grade or class of positions during the period." (§ 31461, subd. (a).) And, as a final example, *In re Retirement Cases* held, based on the unambiguous language of CERL, that terminal pay cannot be deemed compensation earnable because it does not meet the definition of final compensation. (*In re Retirement Cases*, *supra*, 110 Cal.App.4th at pp. 473-476.) If CERL boards nevertheless possessed expanded discretion under *Guelfi* to include terminal pay in compensation earnable, such discretion would be in direct contravention of the CERL statutes defining final compensation. In short, appellants' position is not supportable under the language of CERL.

Moreover, if CERL boards did possess some undefined discretion to include additional pay items in compensation earnable, it is hard to see where that seemingly limitless discretion would end. Could a board, for instance, decide to include the monetary value of in-kind advantages provided to members in compensation earnable, despite the language of section 31460? Or items of compensation earned many years before the final compensation period just because it wanted to? The answer seems, obviously, to be no. In the end, we believe that the correct understanding of board discretion under CERL lies somewhere in between the expanded notion of *Guelfi* discretion espoused by appellants and the constrained, arithmetical approach endorsed by the trial court. Indeed, an appropriate formulation of this more limited board discretion

26

under CERL is located in the body of *Guelfi*, itself, where, in response to the argument that section 31461 "merely calls upon the [b]oard to make a rudimentary calculation of average compensation based on the year selected by the retiree," the appellate court opined: "appellant's argument must be rejected and section 31461 be read as vesting the [b]oard with authority to determine, *according to the guiding language contained therein*, which elements of compensation constitute 'compensation earnable' for purposes of inclusion or exclusion from the calculation of 'final compensation.' " (*Guelfi*, *supra*, 145 Cal.App.3d at pp. 304-305.) This language was also referenced by the Legislature in its repeal of section 31460.1. (Stats. 1992, ch. 45, § 3.)

For all of these reasons, we reject appellants' argument that the Boards possess *Guelfi* discretion—that is, the ability to include additional pay items in compensation earnable, unmoored by the language of CERL. An item of compensation is either includable in compensation, compensation earnable, and final compensation under the CERL statutes, or it is not. If it fails to satisfy any one of these statutory litmus tests, it may not be included in a member's pensionable compensation under CERL.

Cognizant that our appellate review of this matter must necessarily be colored by all of the many standards here articulated, we next turn to the issues of statutory interpretation before us.

## B.     *Interpretation of Section 31461*

As all of the parties to this dispute acknowledge, whether the changes to section 31461 effected by AB 197 unconstitutionally impair the vested pension rights of legacy members of CCCERA, ACERA, and MCERA depends, at least as an initial matter, on whether those changes actually modified CERL, or were merely clarifying amendments and thus declarative of existing law. If no substantive changes were made, it is difficult to argue that the legislation impermissibly impacted vested rights. This is the position of both the State and the Sanitary District on appeal. Appellants, in contrast, argue that AB 197 drastically altered the existing CERL landscape. As set forth above, the four statutory amendments at issue are all contained in separate subdivisions of new subsection (b) of section 31461, and each expressly excludes a particular type of

27

employee benefit from compensation earnable. We therefore address the impact of each new exclusion in turn.

1. *Leave Cash-Outs Under Subdivision (b)(2).*

We first consider PEPRA's treatment of in-service leave cash-outs as a component of compensation earnable. Under AB 197's amended version of section 31461, compensation earnable expressly excludes "[p]ayments for unused vacation, annual leave, personal leave, sick leave, or compensatory time off, however denominated, whether paid in a lump sum or otherwise, in an amount that exceeds that which may be earned and payable in each 12-month period during the final average salary period, regardless of when reported or paid." (§ 31461, subd. (b)(2).) The State argues, and the trial court below agreed, that the addition of subdivision (b)(2) to section 31461 does not constitute a change in the law because, under the prior version of the statute, compensation earnable was always limited to compensation that was both *earned* and *payable* in the final compensation period. Appellants, unsurprisingly, strongly disagree. On appeal, they argue that the trial court erred in its interpretation of the pre-PEPRA version of section 31461 because: (1) under *Guelfi*, *supra*, 145 Cal.App.3d 297, the Boards had the discretion to include items in compensation earnable regardless of when earned or paid; (2) the trial court's interpretation of the final sentence of section 31461 was incorrect; (3) leave cash-outs are not "earned" for purposes of CERL until a member earns the right to convert unused leave time to cash; and (4) the scope of compensation earnable under PERL is not relevant to the interpretation of CERL in this context, since the two statutes have evolved in significantly different ways. We have already disposed of appellants' misapprehension with respect to so-called *Guelfi* discretion. For purposes of our analysis of in-service leave cash-outs, we will address appellants' other contentions to the extent they focus on whether compensation must be *earned* during the final compensation period in order to be pensionable.

As the State argues on appeal, the essential elements of CERL's definition of compensation earnable have remained unchanged since its codification in 1947—that is, that compensation earnable means "the average compensation as determined by the

28

board, for the period under consideration upon the basis of the average number of days ordinarily worked by persons in the same grade or class of positions during the period, and at the same rate of pay." And that "[t]he computation for any absence shall be based on the compensation of the position held by the member at the beginning of the absence." (§ 31461, subd. (a).; cf. § 31461 as added by Stats. 1947, ch. 424, § 1.) In *Ventura*, our high court interpreted this language to mean "the *average pay of the individual retiring employee* computed on the basis of the number of hours worked by other employees in the same class and pay rate—that is the average monthly pay, excluding overtime, received by the retiring employee for the average number of days worked in a month by the other employees in the same job classification at the same base pay level." (*Ventura*, *supra*, 16 Cal.4th at p. 504, italics added.)

Although the *Ventura* court described compensation earnable as a narrowing of the broader definition of compensation (*Ventura*, *supra*, 16 Cal.4th at pp. 493-494), its interpretation of the statutory definition shows that the concept is really a legal fiction, with the potential to both expand and contract the actual compensation otherwise earned by the retiring employee. Thus, compensation earnable may narrow a retiring employee's compensation by excluding any overtime pay that he or she earned during the final compensation period, while at the same time expanding such compensation to account for any unpaid absences that the employee may have taken during that same timeframe. Regardless of these possible adjustments, however, the touchstone for calculating compensation earnable is still the compensation that was actually *earned* by the retiring employee "in the period under consideration." (See § 31461, subd. (a).)

This basic tenet is made even clearer when one considers the wording of the predecessor to section 31461 contained in the original 1937 Act. Section 8.5 of article 1 of CERL as it was enacted in 1937 defines " '[c]ompensation earnable' by a member" to mean: "the compensation as determined by the retirement board, *which would have been earned by the member had he worked throughout the period under consideration*, the average number of days ordinarily worked by persons in the same grade or class of positions as the positions held by him during such period, and at the rates of

29

compensation attached to such positions, it being assumed that during any absence he was in the position held by him at the beginning of such absence." (Stats. 1937, ch. 677, § 8.5, pp. 1898-1899, italics added.) As the *Ventura* court noted with respect to the 1947 codification of the 1937 Act: "The 1947 statute was enacted as part of Senate Bill No. 1117 (1947 Reg. Sess.) which codified and consolidated laws related to counties. A Legislative Counsel's report on Senate Bill No. 1117 advised that the bill 'makes no substantive changes in existing law, but rearranges and restates in simplified language the substance of existing laws, and repeals obsolete and superseded statutes.' " (*Ventura*, *supra*, 16 Cal.4th at p. 502, fn. omitted.) That the 1947 restatement of compensation earnable was meant to be substantively the same as the 1937 formulation—which was clearly based on the compensation that an individual member could *earn*—lends further support to the premise that compensation must be earned in the final compensation period in order to be pensionable, and we adopt that position.

This determination, however, does not end our analysis of the in-service leave cash-outs here at issue. Rather, the question remains whether in-service leave cash-outs are earned when the leave at issue is accrued or when the employee earns the right to sell that leave in return for cash. The trial court below concluded that a leave benefit is earned when the employee accrues the leave time—that is, at the point when the employee earns the right to be paid without work, and the State endorses this position on appeal. Appellants, in contrast, cite both *Ventura* and *In re Retirement Cases* for the proposition that such leave cash-outs are only earned for purposes of CERL when an employee earns the right to receive cash in-lieu of accrued time.

As stated above, *Ventura* holds that, in addition to base pay, premiums paid to employees in cash "even if not earned by all employees in the same grade or class" are items of compensation that must be included in compensation earnable and thus in final compensation under CERL. (*Ventura*, *supra*, 16 Cal.4th at p. 487.) Among the various premiums considered by *Ventura* were cash payments in lieu of annual leave accrual and as longevity incentives. Specifically, with respect to leave cash-outs, the employees at issue could elect to receive pay in lieu of up to 40 hours of annual leave accrual and, on

30

accruing 400 hours, could elect to be paid for another 40 hours. (*Id.* at pp. 488, 489, fn. 6; see also *id.* at p. 489 & fn. 12 [describing a similar premium for certain unrepresented employees, although it "differed in the number of hours that had to be used and in the amount that could be redeemed"].) The longevity incentive was similar in that it credited employees who had at least five years of service with eight hours of annual leave for each year of service in an amount not to exceed 104 hours. The employee had the option of accruing the additional leave or taking it in cash. (*Id.* at p. 489 & fn. 11.) Under these circumstances, the *Ventura* court determined that "both the longevity bonus and cashed-out accrued vacation are remuneration under section 31460 and, since neither is an excluded 'advantage,' both are 'compensation.' " (*Id.* at p. 497.)

It is true that *Ventura* did not squarely address the timing issue presented in this case. Indeed, given the limited facts disclosed, it is not impossible that a *Ventura* employee could have accrued the maximum number of annual leave hours permitted to be converted into cash in the same final compensation period as the actual cash-out. However, we find the high court's underlying analysis of the issue telling. The *Ventura* court first noted that CERL differs from PERL in its exclusion of in-kind benefits from pensionable compensation. (*Ventura*, *supra*, 16 Cal.4th at p. 497.) Specifically, "even though a noncash 'advantage' may be 'remuneration' for the employee's services, the Legislature has relieved CERL counties of the obligation to assign a cash value to in-kind advantages provided to employees and of including that amount in 'compensation' for pension purposes." (*Ibid.*) The high court, however, found significant the fact that the Legislature did not create a similar exclusion for "cash payments made in lieu of providing the same advantages in kind." (*Ibid.*) Thus, "[w]*hen paid in cash*, the payment is remuneration and, as it is not excluded, it is 'compensation' under section 31460." (*Ibid.*, italics added.)[13]

---

[13] The *Ventura* court's analysis of in-kind benefits makes clear that PERL and CERL developed independently with respect to this issue. More generally, we agree with appellants that PERL and CERL have diverged for many years with respect to compensation earnable, with PERL adding more and more exclusions from pensionable

Applying these general tenets regarding in-kind benefits in the context of annual leave accrual, the *Ventura* court acknowledged that annual leave that is received as time off does not qualify as either compensation or compensation earnable under CERL. (*Ventura*, *supra*, 16 Cal.4th at p. 497.)  Rather, it is the later receipt of regular wages without the necessity of actually working that is the relevant remuneration which is compensation and thus pensionable. (*Ibid.*)  Similarly, "[w]hen an employee elects to receive cash in lieu of accrued vacation," it is receipt of that cash that is the remuneration constituting compensation under CERL. (*Id.* at pp. 497-498.)  In *In re Retirement Cases*, this District acknowledged and endorsed this analysis, holding that if employees "do not or cannot cash out their time prior to retiring, they have received an 'in-kind' benefit, not to be calculated as part of their 'final compensation.' " (*In re Retirement Cases*, *supra*, 110 Cal.App.4th at p. 475.)  The clear implication of the analysis in both cases is that it is the employee's election to turn an otherwise in-kind benefit into cash—either through a leave cash-out or by choosing to receive vacation pay without working—that creates the "remuneration paid in cash" that is pensionable compensation under CERL. (See § 31460.)[14]

compensation while CERL's definition remained essentially intact.  Indeed, the fact that, prior to PEPRA, the State had imposed limits on compensation earnable in its own retirement system but not under CERL systems is consistent with the Legislature's stated "long-standing practice . . . of not intruding into the county decisionmaking process regarding compensation determinations with respect to those county retirement systems." (Stats. 1992, ch. 45, § 3(4).)  Moreover, the fact that the *Ventura* court found PERL instructive when construing the initial intent behind CERL's use of the term compensation earnable does not contradict this conclusion, especially given that it had no difficulty distinguishing PERL when appropriate. (See *Ventura*, *supra*, 16 Cal.4th at p. 497.)

[14] The parties spend considerable time, as did the trial court below, arguing the relevance of the last sentence of subdivision (a) of section 31461 to the issue of leave cash-outs. That sentence provides: " 'Compensation, as defined in Section 31460, that has been deferred shall be deemed "compensation earnable" when earned, rather than when paid.' "  It seems fairly clear that the *Ventura* court viewed this reference to deferred compensation in section 31461 as referring to funds deferred in connection with participation in a deferred compensation plan. (See *Ventura*, *supra*, 16 Cal.4th at

32

Thus, in the end, we endorse the trial court's conclusion that new subdivision (b)(2) of section 31461 does not change existing law with respect to in-service leave cash-outs, while at the same time rejecting its conclusions regarding when such cash-outs are earned for purposes of CERL. In sum, leave cash-outs must be included in a member's pensionable compensation—regardless of when the leave time was accrued—to the extent that member exercises his or her employer-granted option to convert the leave into cash during the final compensation period. In reaching this conclusion, we are aware that the trial court appeared very concerned that permitting leave cash-outs to be pensionable would improperly distort a member's final compensation. For instance, the court characterized the question before it not as whether public employers could allow multiple years of accrued leave to be cashed out in a single year, but instead as "whether or not the law allows that entire cash-out payment to be 'spiked' into the employee's lifetime retirement payment." Similarly, the court opined that section 31461 was unambiguous and that a "clear purpose of both the full statute and its last sentence is to prevent the 'spiking' that is here at issue."

However, as the Supreme Court made clear in *Ventura*, CERL anticipates variation in final compensation based on the inclusion of earned premiums and incentives in an individual member's compensation earnable, even when those cash payments are "not earned by all employees in the same grade or class." (*Ventura*, *supra*, 16 Cal.4th at p. 487.) Moreover, many such premiums and incentives—including the in-service leave cash-outs here at issue—can be understood simply as increased salary payments, specially designed by employers to encourage certain employee behaviors, such as longevity, foregoing time away from work, and the development of special employment-enhancing skills. (See *Ventura*, *supra*, 16 Cal.4th at pp. 488-489, 498.) Thus, for

---

pp. 491, 494-495, 505-506.) However, since we have concluded that accrued leave is not compensation for purposes of section 31460 until such time as an employee incurs the right to receive cash in payment for that time, we need not resolve this dispute. In short, if accrued leave is not compensation pursuant to section 31460 (being an in-kind benefit), it cannot be "[c]ompensation . . . that has been deferred" for purposes of the last sentence of subdivision (a) of section 31461.

instance, the *Ventura* court opined that the longevity incentive at issue in that case—which allowed for the provision to longtime employees of additional cash or vacation days—was "equivalent to increased pay that often accompanies seniority." (*Ventura*, *supra*, 16 Cal.4th at p. 498.)  So too, an annual leave cash-out can be viewed as increased pay—different from the accrual of the vacation time, itself—which compensates long-term employees who sacrifice time off.  We further note that there is no evidence in this record that, at least with respect to in-service leave cash-outs, employers in the Three Counties were allowing excessive amounts to be cashed out annually prior to PEPRA.[15]  And, indeed, if it is seen as a problem, the public employers can always negotiate to stop offering the benefit.  Finally, as detailed above, whatever deal is struck between employers and employees with respect to a member's overall compensation package, the total pensionable costs of that package are intended by CERL to be actuarially accounted for in advance and funded by employer and employee contributions.  (See, e.g., §§ 31453-31454.6; *In re Retirement Cases*, *supra*, 110 Cal.App.4th at pp. 438-439.)  Under such circumstances, we find the trial court's obvious concerns regarding pension "distortion" to be over-stated, at least with respect to the in-service leave cash-outs here at issue.

> 2.  *Terminal Pay Under Subdivision (b)(4).*

We next address PEPRA's express exclusion of so-called terminal pay from compensation earnable.  As set forth above, AB 197 added subdivision (b)(4) to section 31461, which excludes from compensation earnable "[p]ayments made at the termination of employment, except those payments that do not exceed what is earned and payable in each 12-month period during the final average salary period, regardless of when reported or paid."  The trial court concluded that this provision did not amount to a change in

---

[15] For instance, MCERA appears to have allowed an annual vacation sellback of up to 80 hours for certain employees.  Leave cash-outs for ACERA members were limited to the amount of leave a member could accrue in the final compensation period.  And, according to appellants, the vast majority of rank-and-file workers included in CCCERA's membership were unable to cash out any leave in service.

34

existing CERL law, because—contrary to ongoing practice in both Contra Costa and Merced—CERL has always required that compensation must be *payable* during the final compensation period to be included in compensation earnable.[16]  We agree.  Indeed, under prior CERL precedent, we find the exclusion for terminal pay relatively straightforward.

Specifically, in the wake of the Supreme Court's decision in *Ventura*, this District addressed the issue of terminal pay as a component of compensation earnable in *In re Retirement Cases*, *supra*, 110 Cal.App.4th 426.  In that litigation, the appellants argued that one-time cash payments for accrued but unused leave made to plan members upon retirement were essentially indistinguishable from the annual in-service leave cash-outs which *Ventura* held were includable in compensation earnable.  (*Id.* at p. 473.)  The appellate court disagreed, relying on the plain language of section 31462.1 which defines final compensation under CERL as "the average annual compensation earnable by a member during any year elected by a member *at or before the time he or she files an application for retirement*, or, if he or she fails to elect, *during the year immediately preceding his or her retirement*" (italics added).  (See also § 31462 [using similar language in describing the three-year final compensation period].)  In the court's view, this language was unambiguous and clearly excluded from final compensation leave cash-outs that were only payable upon separation from service.  (*In re Retirement Cases*, *supra*, 110 Cal.App.4th at pp. 474-475.)  In reaching this decision, the court made clear— as discussed above in connection with in-service leave cash-outs—that " '[w]here an

---

[16] Pursuant to the *Baker* decision, legacy members of MCERA were able to include up to 160 hours of terminal pay in compensation earnable.  Similarly, Contra Costa's Post-*Ventura* Settlement Agreement and related Board policy make pensionable terminal pay in an amount not to exceed the vacation time accrued by a legacy member in the final compensation period.  ACERA, in contrast, appears to have permitted legacy members to cash-out vacation and sick leave up to the amount accrued in the final compensation period either during that period or at termination.  Since such a cash-out is both earned and payable in the final compensation period, it is not terminal pay, even if a member elects to actually receive the cash after retirement.  To the extent ACERA only allowed portions of this leave cash-out as terminal pay, ACERA legacy members should be included in the estoppel class discussed below.

employee cannot or does not elect to receive cash in lieu of the accrued time off prior to retirement, the benefit remains one of time rather than cash.' " (*Id.* at p. 475.) Under such circumstances, the accrued leave never becomes compensation under section 31640. Rather, for purposes of determining compensation (and thus compensation earnable), the critical moment is when the right to receive cash for accrued leave arises. (*Ibid.*) If it arises only after retirement, it cannot be included in compensation earnable.

One year later, in *Salus*, *supra*, 117 Cal.App.4th 734, the Fourth District essentially adopted the analysis from *In re Retirement Cases* in holding that certain negotiated sick leave payouts made after retirement were not includable in final compensation. (*Salus*, *supra*, 117 Cal.App.4th at pp. 739-742.) In doing so, the *Salus* court distinguished the sick leave payouts from certain lump sum incentive payments which were includable in compensation earnable, because the incentive payments "were at all times cash compensation earned before retirement." (*Id.* at p. 741.) We agree with both *In re Retirement* Cases and *Salus* that, even prior to PEPRA, the plain language of CERL excluded terminal pay from compensation earnable for pension purposes. Pursuant to section 31461, compensation earnable is "the average compensation . . . for *the period under consideration*" (italics added) and that period—either the one-year period established by section 31462.1 or the three-year period set forth in section 31462—plainly excludes compensation that is not earned and payable prior to retirement. (Accord *Mason, supra,* 111 Cal.App.4th at pp. 1227-1228 [under city retirement system, where unused vacation and sick leave "has no cash value" until it can be exchanged for cash after retirement, inclusion in average final compensation for pension purposes is improper].)[17]

---

[17] Although, admittedly, the word "payable" was not expressly included in CERL prior to the AB 197 amendments, we believe that, in this context, it is essentially a synonym for "earned." Compensation for CERL purposes is defined as "remuneration paid in cash." (§ 31460.) Remuneration is pay for work or services. (Cambridge Dictionary http://dictionary.cambridge.org/us/dictionary/english/remuneration [as of January 4, 2018].) Thus, if compensation is "earned" during the final compensation period, the employee earns the right to be paid for work in cash—that is, the cash becomes payable.

Appellants nevertheless argue that, because the rights of legacy members to include terminal pay in compensation earnable are contained in the Post-*Ventura* Settlement Agreements, which pre-dated the appellate decisions in *In re Retirement Cases* and *Salus,* they must be judged by judicial precedent existing at the time those rights were created. Moreover, appellants assert, since making terminal benefits pensionable was "plainly legal" at the time the relevant contract rights were created, subsequent precedent cannot eliminate those rights. As the trial court correctly recognized, however, the weight of authority is contrary to appellants' claims.

Indeed, although the shoe was essentially on the other foot, the court in *In re Retirement Cases* considered and rejected a similar argument. In that case, the counties and the CERL boards argued that applying *Ventura* retroactively would unconstitutionally impair their contract expectations, given that counties and plan members had "entered into employment arrangements based on pre-*Ventura* rules of law." (*In re Retirement Cases*, *supra*, 110 Cal.App.4th at pp. 446-447.) In addressing this claim, the appellate court opined that existing law did include "decisions of the appellate courts interpreting statutes" and noted that the trial court had "specifically found that retirement boards and counties relied on the law as stated in *Guelfi*." (*In re Retirement Cases*, *supra*, 110 Cal.App.4th at pp. 446-447.) Nevertheless, the court soundly rejected the counties' vested rights argument, determining that the law in effect at the time plan members accepted employment was not *Guelfi*, it was CERL. (*In re Retirement Cases*, *supra*, 110 Cal.App.4th at p. 453; see also *id.* at pp. 453-454 [when members entered into employment contracts they "agreed to have their 'compensation earnable' and 'final compensation' calculated pursuant to CERL"].) Under such circumstances, the fact that CERL boards had mistakenly provided pension benefits based on *Guelfi*'s flawed construction of CERL law was insufficient to create a vested

---

Under such circumstances, we view PEPRA's insertion of the term "payable" in section 31461 to be simply a clarification that, once the right to compensation is *earned* in the final compensation period it is includable in compensation earnable, even if it happens to be actually *paid* at a later time. This is consistent with the pre-PEPRA version of CERL as discussed above.

37

right in the continuation of that erroneous practice.  (*In re Retirement Cases*, *supra*, 110 Cal.App.4th at pp. 452-454.)  Thus, assuming that the high court ultimately endorses the statutory analysis of terminal pay set forth in *In re Retirement Cases*—an eventuality we see as extremely likely—appellants cannot rely on the prior lack of dispositive precedent characterizing terminal pay as non-pensionable in making their statutory vested rights argument.  Rather, the inclusion of terminal pay in compensation earnable was not "plainly legal" at the time the Post-*Ventura* Settlement Agreements were entered into, because the relevant law was, and continues to be, CERL.

In addition, appellants cannot successfully argue that the characterization of terminal pay as compensation earnable pursuant to the Post-*Ventura* Settlement Agreements created a vested right under those contracts to treat such pay as pensionable. Indeed, it is fairly clear that a contract that attempts to characterize an item of compensation in a manner contrary to statute cannot, itself, create a vested right.  *Oden v. Board of Administration* (1994) 23 Cal.App.4th 194 (*Oden*), for example, dealt with the characterization of employee pension contributions under PERL.  In that case, the appellate court agreed with the general position of the PERS board that contributions made as employee-paid salary deductions should be treated as compensation for pension purposes, but contributions made through employer-paid salary additions should not.  (*Id.* at pp. 199-200, 202-209.)  The PERS board, however, recognized an exception to this general rule for a few public agencies who had stipulated in collective bargaining agreements to treat employer paid contributions " 'as if' " they were a part of an employee's base salary and therefore compensation.  (*Id.* at pp. 200-201.)  The *Oden* court rejected this approach, stating:  "The Board's distinction among employer-paid member contributions rests entirely upon the characterization elected in bargaining agreements and is untenable because public agencies are not free to define their employee contributions as compensation or not compensation under PERL—the Legislature makes those determinations.  Statutory definitions delineating the scope of PERS compensation cannot be qualified by bargaining agreements."  (*Id*. at p. 201.)

Similarly, in *Medina v. Board of Retirement* (2003) 112 Cal.App.4th 864 (*Medina*), several employees of a local retirement system were erroneously classified as safety members for many years until the mistake was discovered and corrected. (*Id.* at pp. 866-868.) Since safety members are entitled to greater pension benefits than general members, the employees filed a petition for writ of mandate, arguing, among other things, that they had obtained a vested right to continue to be classified as safety members. (*Id* at pp. 866-867.) The *Medina* court rejected this assertion, stating that "[t]he contract clause does not protect expectations that are based upon contracts that are invalid, illegal, unenforceable, or which arise without the giving of consideration." (*Id.* at p. 871.) Since "[a]ny purported contract to give appellants the pension benefits of safety members was invalid, . . . the vested rights doctrine [did] not apply." (*Id.* at p. 872 [characterizing the board's mistake as "the equivalent of attempting to form an unauthorized contract"]; see also *County of Orange, supra,* 52 Cal.4th at p. 1183 ["[w]here the relationship [is] governed by contract, a county may be bound by an implied contract (or by implied terms of a written contract), *as long as there is no statutory prohibition against such an agreement*," (italics added)]; *City of San Diego v. San Diego City Employees' Retirement System* (2010) 186 Cal.App.4th 69, 80 [rejecting retirement board's attempt to charge city for underfunding of certain pension liabilities as contrary to the pension system's enabling statutes; "it is not within [the board's] authority to expand pension benefits beyond those afforded by the authorizing legislation"].) In short, precedent dictates that no vested pension rights can be created by contracts that are inconsistent with the governing pension statutes.

3.      *Pay "Outside of Normal Working Hours" Under Subdivision (b)(3).*

The third express exclusion from compensation earnable articulated by the AB 197 amendments is found in subdivision (b)(3) of section 31461, which establishes that "[p]ayments for additional services rendered outside of normal working hours, whether paid in a lump sum or otherwise" may not be included in compensation earnable. No party argues that overtime pay was ever a permissible component of compensation earnable under CERL. However, the parties strongly dispute whether on-call, standby

39

and similar pay items—designed to compensate employees for time outside of their regular working hours during which they must remain available to be called back to work—should be included in pensionable compensation. Once again, this question hinges on whether such payments were properly included in compensation earnable under the pre-PEPRA version of CERL (and are therefore subject to a vested rights analysis), or whether they have always been, and continue to be, properly excluded from pensionable compensation under that statute.

The trial court appears to have concluded that a limited vested right does exist with respect to certain on-call payments, because, although it did not engage in a vested rights analysis, it directed the Boards to continue to include these types of compensation in compensation earnable for legacy members to the extent that: the pay category at issue was previously included in compensation earnable; the amount to be included was both earned and required of the employee during his or her final compensation period; the form of compensation was "regularly applicable to the class of employees"; and the payment was not designed "to 'enhance' the pension." In order to determine the appropriateness of the trial court's order, we must first articulate what was permissible under the prior version of section 31461 with respect to on-call pay. We must then consider whether AB 197 effected a change in that law. As will become apparent, the answer to both of these questions is not entirely clear.

We start with *Ventura*, as one of the premiums and incentives at issue in that case was a form of on-call pay ($60 biweekly) used to compensate certain deputy sheriffs, senior deputy sheriffs, pilots, and crew chiefs for remaining subject to call during meal periods. (*Ventura*, *supra*, 16 Cal.4th at p. 488 & fn. 5.) The *Ventura* parties agreed that this pay was furnished uniformly to all sheriff's pilots and was therefore compensation earnable for that group of employees. Similar pay for the other employee classifications, however, remained in dispute. (*Ibid.*) Presumably, the benefit was not provided uniformly to all of the employees in those classes. The *Ventura* court described on-call pay as "specified payments in lieu" of overtime pay and concluded that the payments were remuneration for services and thus compensation under CERL. (*Id.* at pp. 488 &

40

fn. 5, 498.)  In addition, as discussed above, the court ultimately determined that—with the exception of employer contributions to an employee's deferred compensation plan—*all* of the disputed premiums at issue in that case were includable in compensation earnable and thus pensionable, even if not earned by all employees in the same grade or class.  (*Id*. at p. 487.)  However, there is no specific analysis in the opinion regarding on-call pay as a component of compensation earnable.  (*Id.* at pp. 499-506.)  Thus, although it can be inferred from *Ventura* that the on-call pay at issue in that case—pay for being on call during meal periods—constituted compensation earnable pre-PEPRA, even if it was not earned by all employees in the same grade or class, the bases and parameters for this conclusion are not readily apparent.[18]

In the end, although *Ventura*'s discussion of CERL's pre-PEPRA treatment of on-call pay is helpful as far as it goes, we believe a more comprehensive treatment of the issue is necessary in order to resolve the present dispute.  In this regard, we find this District's decision in *Shelden v. Marin County Employees' Retirement Assn.* (2010) 189 Cal.App.4th 458 (*Shelden*) instructive.  *Shelden* involved a disagreement over whether a deputy sheriff's overtime pay for participation in an arrest warrant service team constituted compensation earnable under CERL.  (*Id.* at pp. 460-462.)  Pursuant to the pre-PEPRA version of section 31461.6, compensation earnable expressly excluded "overtime premium pay other than premium pay for hours worked within the normally scheduled or regular working hours that are in excess of the statutory maximum workweek or work period applicable to the employee under Section 201 and following of Title 29 of the United States Code."  Thus, the question before the court was "whether the overtime hours Shelden worked on the arrest warrant service team were within his 'normally scheduled or regular working hours.' " (*Shelden*, *supra*, 189 Cal.App.4th at p. 464.)

---

[18] It seems unlikely that these payments were excluded from compensation earnable as overtime under *Ventura*, given that the *Ventura* court left in place the parties' agreement that the on-call payments provided uniformly to sheriff's pilots were properly characterized as compensation earnable.  (*Ventura*, *supra*, 16 Cal.4th at p. 488 & fn. 5.)

41

The *Shelden* court concluded that the overtime hours at issue were properly excluded from compensation earnable. The court acknowledged that Shelden performed the work "regularly (once a week) and for a long period of time (about four years)." (*Shelden*, *supra*, 189 Cal.App.4th at p. 464.) Nevertheless, it found the work to be excludable overtime because: Shelden performed the work on what he characterized as his day off; he was not required to perform the work, but instead volunteered to do it; he was not required to take a sick day or vacation leave if he could not complete the shift; he did not pay into the retirement system for the time; and the sheriff considered the work to be outside of regular working hours. (*Ibid*.) While the on-call premiums at issue here are not technically overtime (the *Ventura* court characterized them as payments "in lieu" of overtime pay), we believe they bear some relationship to an employee's regular work schedule. Thus, while not directly relevant, we find *Shelden* useful in its articulation of what was and was not considered overtime under pre-PEPRA CERL.

Indeed, our own reading of the pre-PEPRA version of section 31461—as informed by both *Ventura* and *Shelden*—leads us to the conclusion that on-call, standby and similar payments were includable in compensation earnable prior to AB 197 to the extent that they constituted remuneration for on-call services provided by an employee as part of his or her regular work assignment. Thus, if an employee was required to be on-call for a certain number of hours each work period as part of his or her normal duties, any premium pay received in connection with that assignment was includable in compensation earnable under CERL as it existed prior to AB 197. If, in contrast, an employee volunteered for additional on-call hours, any payments received in connection with that extra work would be akin to overtime premium pay and excludable from compensation earnable on that basis. This appears to have been CCCERA's position pre-PEPRA and, in fact, the State has not really challenged it, focusing instead—in both the trial court and on appeal—on the problem of compensation for voluntary on-call shifts. Moreover, although this matter was not directly addressed in *Ventura*, it seems highly likely that the employees at issue in that case were receiving on-call pay because they

42

were required to remain subject to call during lunch as part of their regularly scheduled work assignment. Thus, our holding does not conflict with that precedent.

The harder question is whether, prior to AB 197, CERL only permitted on-call payments to be pensionable to the extent that they were received by others in the same grade or class. The trial court concluded that any vested right of legacy members to treat on-call payments as pensionable was limited to situations where such pay was "regularly applicable to the class of employees." PERS contains a similar restriction. (See § 20636, subd. (c)(2) [for purposes of compensation earnable "[s]pecial compensation" is limited to "that which is received by a member pursuant to a labor policy or agreement or as otherwise required by state or federal law, to similarly situated members of a group or class"].) Nevertheless, based on *Ventura*, we must reach the opposite conclusion. In short, the *Ventura* court was clearly focused on compensation earned by the individual employee, not the class; it expressly held that compensation paid in cash, other than overtime, was compensation earnable "even if not earned by all employees in the same grade or class"; and it included in compensation earnable the on-call pay received by the deputy sheriffs at issue in that case, even though the benefit was apparently not furnished uniformly to all deputy sheriffs. (*Ventura supra*, 16 Cal.4th at pp. 487-488 & fn. 5, 499-505.) Under these circumstances, we must conclude that any pre-PEPRA right to the inclusion of on-call pay in compensation earnable is not limited to those on-call premiums received by employees in the same group or class.[19]

---

[19] As stated above, the trial court also limited the vested right it crafted for legacy members with respect to on-call payments to situations where the "pay category was previously included" in compensation earnable and the on-call compensation was not received to " 'enhance' the pension." We reject both of these additional limitations. Any vested right legacy members possess to have their pensions calculated in accordance with CERL as it existed prior to AB 197 is not limited by the applicable pay codes in existence prior to the change in the law. Rather, the right is based on the statute, itself, and thus necessarily encompasses any form of compensation that would have been pensionable under the prior version of CERL, whether currently offered by a particular employer to a particular employee or not. Thus, while the current pay structure is obviously the place to start, new or modified on-call benefits added to legacy members' compensation prior to retirement might also be pensionable under a vested rights analysis. In addition and as

43

Since we have concluded that legacy members were previously entitled to the inclusion of on-call pay in the calculation of their pension benefits (to the extent the related on-call duty was part of their regular work assignment), we must next determine whether AB 197's addition of subdivision (b)(3) to section 31461 changed the law with respect to the treatment of on-call premium pay. The trial court implicitly concluded that it did, as there would otherwise have been no reason to recognize a vested right in this area for legacy members. And, indeed, it is difficult to argue that the amendment of section 31461 to expressly exclude from compensation earnable "[p]ayments for additional services rendered outside of normal working hours" was not intended to exclude all on-call pay from pensionable compensation under CERL. (§ 31461, subd. (b)(3).)

In fact, the "normal working hours" language of new subdivision (b)(3) was lifted directly from the corresponding definition of compensation earnable under PERL. (See § 20636, subd. (c)(7)(B) [defining special compensation for purposes of compensation earnable as expressly excluding "[p]ayments made for additional services rendered outside of normal working hours, whether paid in lump sum or otherwise"]; see also § *id.*, subd. (c)(3) [same].) This, at the very least, evinces an intent on the part of the Legislature to treat the two retirement systems similarly with regard to on-call pay. (*Ventura*, *supra*, 16 Cal.4th at p. 504 [noting that "[t]he Legislature is presumed to be aware of other statutes on the same or analogous subject matter in which the same language is used"].) Indeed, appellants concede as much. Moreover, at the time AB 197 was drafted, PERS apparently took the position that, based on this "normal working hours" language, on-call pay was not reportable compensation for retirement purposes under PERL. (See *City of Pleasanton v. Board of Administration* (2012) 211 Cal.App.4th 522, 528-529 (*City of Pleasanton*).) And, shortly after AB 197 was approved by the

---

discussed further below, prior to AB 197, pay items that otherwise would have been includable in compensation earnable could not be excluded based on any subjective intent behind the payment. Thus, whether the on-call benefits were meant to "enhance" a legacy member's pension is irrelevant to our vested rights analysis.

44

Governor in September 2012 (see Stats. 2012, ch. 297, § 2), this District expressly held that on-call or standby pay was not special compensation under PERL because it was not compensation for services rendered during normal working hours. (*City of Pleasanton*, *supra*, 211 Cal.App.4th at pp. 537-540.) Thereafter, based on PERL and *City of Pleasanton*, the Boards concluded post-PEPRA that "the Legislature sought to abandon the 'required overtime' analysis for such pay items" set forth in *Shelden*, and, as a result, excluded all on-call pay from compensation earnable.

Were we writing on a clean slate, we believe an argument could be made that the "normal working hours" language now contained in both PERL and CERL should be read broadly enough to permit the inclusion of on-call pay that is part of an employee's required work assignment in compensation earnable. Although perhaps rendered outside of a standard 40-hour workweek, on-call pay for services required to be provided as part of a particular job would seem to be akin to additional salary—albeit salary that is calculated at a rate which recognizes that being on-call, while restrictive, is not as onerous as being fully on duty. (But see *City of Pleasanton*, *supra*, 211 Cal.App.4th at p. 539 [concluding that on-call duty was not part of a normal workweek where the employee was only being compensated "at a small fraction of his base salary"].) Thus, such pay appears analytically similar to the many other premiums found pensionable by *Ventura.* However, given the historical construction of this language under PERL, it would seem that the Legislature's intent in adding the restriction to CERL was otherwise. Since we conclude that AB 197 meant to exclude from compensation earnable the types of on-call and standby pay here at issue—and because we have also determined that certain of those pay items were includable in pensionable compensation prior to PERPA—we address below whether legacy members possess a vested right to the calculation of their pension benefits under the prior version of section 31461 with respect to on-call pay.

45

4.      *Enhancement Payments Under Subdivision (b)(1).*

The final subdivision of new subsection (b) of section 31461 at issue in this appeal is subdivision (b)(1), which excludes from compensation earnable "[a]ny compensation determined by the board to have been paid to enhance a member's retirement benefit." The subdivision goes on to provide a number of non-exclusive examples of possible enhancement benefits, including: cash payments made during the final compensation period for benefits previously received in kind (§ 31461, subd. (b)(1)(A)); one-time payments received by a member, but not by others in that member's class (§ 31461, subd. (b)(1)(B)); and payments made solely due to termination of employment, even if received while still employed, to the extent they are greater than amounts earned and payable during the final compensation period (§ 31461, subd. (b)(1)(C)). According to the trial court, there was no dispute below that subdivision (b)(1) is new law "insofar as it places upon the board of CER[L] retirement associations the obligation to determine whether specific compensation has been paid to a new retiree 'to enhance a member's retirement benefit.' " Moreover, the trial court found that at least one Board had proactively changed its policies in response to this new requirement, uniformly excluding certain one-time payments from compensation earnable.[20] Despite these circumstances, however, the trial court refused to find that legacy members had a vested right to calculation of their retirement benefits free from the impact of subdivision (b)(1). Instead, it took a wait-and-see attitude, opining that it was unclear that any issues would ever even come up under this new statute.

Predictably, appellants now challenge on appeal the trial court's refusal to reach the merits of the vested rights issue with respect to subdivision (b)(1). They further claim that the trial court should have ordered, at least for legacy members, the restoration of any one-time payments prematurely excluded from compensation earnable in response to this new statutory requirement. In contrast, the State makes a relatively strained

---

[20] Specifically, based on the addition of subdivision (b)(1) to section 31461, ACERA reportedly excluded from compensation earnable for all members various one-time payments, employee of the month payments, and "Share the Savings" payments.

argument on appeal that payments made to enhance pension benefits as described by subdivision (b)(1) have always been excluded from compensation earnable under CERL. In particular, the State appears to maintain that, since pension enhancements were always required to be excluded from pensionable compensation, subdivision (b)(1) merely places on CERL boards the express obligation to ferret out any of these unlawful inclusions.

We have little difficulty determining that appellants have the better argument here with respect to subdivision (b)(1). Clearly, prior to PEPRA, there was no provision in CERL allowing a CERL board to look behind an employer's provision of compensation to its employees to determine that employer's subjective intent, much less was any such intent ever considered dispositive when determining whether a particular item of compensation was pensionable. Rather, as emphasized in *Ventura*, with the exception of overtime, items of compensation paid in cash, "even if not earned by all employees in the same grade or class, *must* be included in the 'compensation earnable' and 'final compensation' on which an employee's pension is based." (*Ventura*, *supra*, 16 Cal.4th at p. 487, italics added.)

While this is obviously not the forum for an exhaustive examination of every possible item of compensation potentially subject to subdivision (b)(1) to determine whether that item was properly included in compensation earnable under the pre-PEPRA version of CERL, several examples are telling. For instance, *Ventura* clearly holds with respect to in-kind payments that, "[w]*hen paid in cash*, the payment is remuneration and, as it is not excluded, it is 'compensation' under section 31460." (*Ventura*, *supra*, 16 Cal.4th at p. 497, italics added.) Moreover, Ventura concluded that such cash payments must also be included in compensation earnable and therefore in a member's final compensation. (*Id.* at p. 487.) It would thus appear that, prior to PEPRA, if an employee-member had the option of receiving an in-kind benefit in cash and chose to do so during the final compensation period, that benefit must have been included in compensation earnable, regardless of the intent of any party and contrary to subdivision (b)(1). Similarly, *Ventura* holds that any premiums received by an employee—over and above base salary and excluding overtime—are properly included in compensation

47

earnable, "even if not earned by all employees in the same grade or class." (*Ventura*, *supra*, 16 Cal.4th at p. 487.) Under these circumstances, any number of premium payments, even if provided on a one-time basis and not to all class members, would appear to have been compensation earnable pre-PEPRA, regardless of any implication to the contrary found in subdivision (b)(1). Thus, the addition of this new subdivision to section 31461 clearly effected a change in CERL law.[21]

Additionally, we agree with appellants that, should they possess a vested right to have their pensions calculated without reference to subdivision (b)(1), this includes the right to inclusion in compensation earnable of any one-time or other "enhancement" payment previously authorized by CERL, irrespective of whether a Board has subsequently adopted a wholesale exclusion of such payments based on its interpretation of the new statute. Indeed, new section 31542, which details the procedure to be followed when making an enhancement determination under subdivision (b)(1)— including the right to present contrary evidence and judicial review of individual enhancement decisions—argues against the automatic exclusion of any particular type of compensation under subdivision (b)(1), even for new hires who are clearly subject to PEPRA. (See § 31542, subds. (a) & (b); see also *Marin*, *supra*, 2 Cal.App.5th at pp. 692-

---

[21] We are not persuaded that the State's citation to *Hudson v. Board of Administration* (1997) 59 Cal.App.4th 1310 (*Hudson*) supports the contrary position. In *Hudson*, a city allowed its employees to convert certain employer-paid benefits—such as insurance, automobile allowances, and PERS member contributions—to salary increases if they agreed to retire within 12 months. (*Id*. at pp. 1316-1317.) The express purpose of the conversions was to increase the appellants' final compensation so that they would receive higher pensions. (*Id.* at p. 1316.) The *Hudson* court concluded that these benefit conversions did not constitute compensation earnable under PERL, based on a specific exclusion in PERL for "final settlement pay." (*Id.* at pp. 1318-1324; see also former § 20022, subd. (b)(8) [excluding as final settlement pay " 'any pay in excess of salary granted or awarded in connection with a separation from employment . . .' "].) Thus, *Hudson* obviously has no relevance to our interpretation of pre-PEPRA CERL, which contained no such exclusion. Moreover, even under PERL, *Hudson* does not stand for the proposition that all of the benefits potentially includable in subdivision (b)(1) as impermissible enhancements must be excluded from pensionable compensation.

693 [recognizing that section 31542 was "intended to govern individual determinations" and " 'requires an analysis specific to the particular member' "][22].)

The trial court may ultimately be correct that, going forward, pension disputes based on the addition of subdivision (b)(1) to CERL will be rare. At least as an initial matter of statutory interpretation, however, we believe that this new requirement has the potential for broad application to many different types of compensation. Indeed, an argument can be made that every item of compensation received by a CERL employee is paid, at least to some extent, to enhance that member's pension. Thus, in theory, subdivision (b)(1) could significantly impair the stability and predictability of a member's anticipated pension benefit, as any particular item of compensation received

---

[22] The *Marin* court ultimately opined that Marin CERA had not impermissibly excluded whole categories of compensation from compensation earnable on the basis of subdivision (b)(1) without making the findings required by the new statute. (*Marin*, *supra*, 2 Cal.App.5th at p. 693.) To the contrary, the court concluded that section 31542 was only meant to be applied to legacy members when they put in for retirement and that the construction of the statute that the plaintiffs were seeking "would initiate the calculation process for every employee affected by the change," which would "entail a massive expenditure of administrative resources devoted to an individualized inquiry that would be pointless for all employees not on the cusp of retirement." (*Marin*, *supra*, 2 Cal.App.5th at p. 693.) In our view, however, that is exactly the point, as argued by both the *Marin* plaintiffs and appellants here. If CERL boards decide to prophylactically remove various types of compensation from compensation earnable without any individualized inquiry on the basis of (b)(1), that compensation will automatically be excluded from a member's pension calculation and no retirement contributions will be collected with respect to it. It is unclear whether new subdivision (b)(1) allows for this type of global process, instituted potentially years before a member's actual retirement and/or receipt of the "enhancement" benefits at issue. At the very least, if CERL boards desire to adopt such a procedure in response to AB 197, it seems that they would need to make specific findings regarding employer intent and then, at least at some point, send notice to all potentially affected employees, who would then have individualized rights under section 31542 to contest the decision as it relates to them. In the end, since we are here focused on the rights of legacy members and have concluded that subdivision (b)(1) constitutes new law for purposes of a vested rights analysis, we need not reach this issue. Instead, we confine ourselves to the conclusion that, if appellants have a vested right to have their pensions calculated free from the requirements of subdivision (b)(1), this would encompass the right to have included in their compensation earnable any pay items that have been uniformly excluded in response to that new statute.

49

during that member's final compensation period could be subject to an after-the-fact re-characterization as an impermissible enhancement. We believe that the trial court erred in refusing to determine whether legacy members have a vested right to be free from this uncertainty. In sum, since we conclude that subdivision (b)(1) represents a change to prior CERL law, it must be subjected to a vested rights analysis to determine whether legacy members have the right to have their pensions calculated without reference to its new prescriptions.

## C.     *Vested Rights*

Having concluded that AB 197 did in fact make some substantive changes to CERL (with respect to on-call pay and so-called pension enhancements), we are faced squarely with the question of whether those changes constitute a reasonable modification to prior CERL law or whether their effect is to impair the vested contractual rights of CCCERA, ACERA, and MCERA legacy members. Recently, our colleagues in Division Two addressed this same issue with respect to legacy members of the Marin County Employees' Retirement Association (Marin CERA) and concluded that the amendment of section 31461 did not amount to an unconstitutional impairment of vested pension rights. (*Marin*, *supra*, 2 Cal.App.5th at pp. 693-709.) As this issue is crucial to the resolution of our case, we will discuss the *Marin* holding in some detail. Preliminarily, however, we review precedent, specific to our high court, delineating the scope of a public employee's vested pension rights.

1.     *Supreme Court Jurisprudence on Vested Pension Rights*.

In California, the modern law of public pensions begins with *Kern v. City of Long Beach* (1947) 29 Cal.2d 848 (*Kern*). In that case, the City of Long Beach (Long Beach), pursuant to a provision of its city charter, offered a pension to city employees after 20 years of service in an amount equal to 50 percent of their annual salaries. (*Id.* at p. 850.) Approximately 32 days before petitioner Kern completed his required 20 years of service, Long Beach amended its charter to eliminate pensions for all persons not then eligible to retire. (*Ibid.*) The Supreme Court concluded that Kern had acquired a vested right to a

50

pension which Long Beach could not abrogate without impairing its contractual obligations, and thus the repeal was ineffective as to Kern. (*Id.* at p. 856.)

In reaching this conclusion, the *Kern* court noted that, where services are rendered under a pension statute, " 'the pension provisions become part of the contemplated compensation for those services and so in a sense a part of the contract of employment itself.' " (*Kern*, *supra*, 29 Cal.2d at p. 852.) Thus, " '[t]hey are in effect pay withheld to induce long-continued and faithful services.' " (*Ibid.*; see also *Id*. at p. 856 [stating that "one of the primary objectives in providing pensions for government employees . . . is to induce competent persons to enter and remain in public employment"].) Moreover, although "an employee does not earn the right to a full pension until [he or she] has completed the prescribed period of service," that employee "has actually earned *some pension rights* as soon as [he or she] has performed substantial services" for the public employer. (*Id.* at p. 855, italics added.) Under such circumstances, the fact that the pension benefits are deferred and may be dependent on certain contingencies (such as continued employment), "does not prevent a contract from arising, and the employing governmental body may not deny or impair the contingent liability any more than it can refuse to make the salary payments which are immediately due." (*Ibid.*)

The *Kern* court acknowledged, however, that "pension systems must be kept flexible to permit adjustments in accord with changing conditions and at the same time maintain the integrity of the system and carry out its beneficent policy." (*Kern*, *supra*, 29 Cal.2d at pp. 854-855.) Although it was unnecessary for the high court to consider the "permissible scope" of changes to pension provisions given the facts of the case before it, it summarized the vested pension rights of public employees generally in the following oft-quoted language: "[A]n employee may acquire a vested contractual right to a pension but that . . . right is not rigidly fixed by the specific terms of the legislation in effect during any particular period in which [he or she] serves. The statutory language is subject to the implied qualification that the governing body may make modifications and changes in the system. *The employee does not have a right to any fixed or definite benefits, but only to a substantial or reasonable pension.* There is no inconsistency

51

therefore in holding that [the employee] has a vested right to a pension but that the amount, terms and conditions of the benefits may be altered." (*Id.* at p. 855, italics added.)

Over the next 60 years, the high court was forced to address the question it had left unanswered regarding the permissible scope of pension modifications. In doing so, it fleshed out its own particular views on the parameters of the vested public pension rights it had recognized in *Kern*. Thus, for example, in *Packer v. Board of Retirement* (1950) 35 Cal.2d 212 (*Packer*), the Supreme Court found permissible a pension modification which permitted a "widow's pension" only if the husband agreed to take a lesser pension for himself. (*Id.* at pp. 213-214.) The court was influenced by the fact that the change was part of a "substantial revision" to the retirement law which, under certain circumstances, actually gave county peace officers greater benefits than they had before. (*Id.* at pp. 214, 218.) In contrast, in *Wallace v. City of Fresno* (1954) 42 Cal.2d 180 (*Wallace*), the Supreme Court rejected a pension modification which gave the pension board discretion to terminate an employee's pension if the recipient was convicted of a felony. (*Id.* at pp. 181-182.) Wallace was convicted of a felony after he retired as the city's chief of police. (*Id.* at p. 181.) The change was unreasonable because "[t]he termination of all pension rights upon conviction of a felony after retirement does not appear to have any material relation to the theory of the pension system or to its successful operation." (*Id.* at p. 185.)

In 1955, the Supreme Court revisited Long Beach's retirement obligations in *Allen v. City of Long Beach* (1955) 45 Cal.2d 128 (*Allen I*). After offering no pension benefits to policemen or firemen hired between March 29, 1945, and 1950, Long Beach had contracted with the State to make these post-1945 employees members of the State's retirement system. Thereafter, in 1951, Long Beach amended its charter to alter the pension rights of the policemen and firemen employed prior to March 29, 1945 (pre-1945 employees). (*Id.* at p. 130.) According to Long Beach, the changes were made to " 'somewhat equalize' " the compensation paid to the pre-1945 and post-1945 employees, as they were performing like services. (*Id.* at p. 133.)

The *Allen I* court acknowledged that vested contractual pension rights may be modified prior to retirement "to permit adjustments in accord with changing conditions and at the same time maintain the integrity of the system." (*Allen I*, *supra*, 45 Cal.2d at p. 131.)  However, the court opined that any "[s]uch modifications *must be reasonable*, and it is for the courts to determine upon the facts of each case what constitutes a permissible change.  *To be sustained as reasonable*, alterations of employees' pension rights must bear some material relation to the theory of a pension system and its successful operation, and changes in a pension plan which result in disadvantage to employees should be accompanied by comparable new advantages." (*Ibid.*, italics added.)  Applying this new test to the modifications at issue, the *Allen I* court concluded the changes were not reasonable as applied to the pre-1945 employees because they were all detrimental and were instituted without any corresponding increase in benefits.  (*Id.* at pp. 131-133.)  Moreover, and on the other side of the coin, there was no indication that Long Beach would have any difficulty meeting its pension obligations to *the pre-1945 employees* under the prior system and the rationale for the changes bore "no relation to the functioning and integrity of the pension system" established for those employees.  (*Id.* at p. 133.)

*Abbott v. City of Los Angeles* (1958) 50 Cal.2d 438 (*Abbott*), thereafter underscored that "it is advantage or disadvantage *to the particular employees* whose own contractual pension rights, already earned, are involved which are the criteria by which modifications to pension plans must be measured." (*Id.* at p. 449, italics added, see also *id.* at p. 453.)  In finding a change from a fluctuating to a fixed pension system unreasonable, the *Abbott* court rejected as "speculation" the argument that rising costs might otherwise cause the pension system to cease to exist.  Specifically, the court opined:  "Rising costs alone will not excuse the city from meeting its contractual obligations, the consideration for which has already been received by it.  Moreover, it is not to be assumed that the city would have attempted to abolish its pension system by reason thereof, especially since such systems are almost universally essential in order to attract qualified employees." (*Id.* at pp. 445, 455.)

53

In 1977, the Supreme Court considered a change in the mandatory retirement age for state employees from 70 to 67. (*Miller v. State of California* (1977) 18 Cal.3d 808, 811.) Distinguishing the terms and conditions of public employment from the potential pension implications of that employment, the court concluded that the plaintiff had no "vested contractual right to continue in employment beyond the time or contrary to the terms and conditions fixed by law." (*Id.* at pp. 813-814.) Since no modification to the plaintiff's pension rights had occurred, there was no need for an analysis under *Allen I* or *Abbott*. (*Id.* at p. 818.)

A year later, the high court clarified that a public employee is entitled to the benefits resulting from positive changes to the pension system made at any time during employment—such benefits become a part of the vested rights of employees when conferred. (*Betts v. Board of Administration* (1978) 21 Cal.3d 859.) Thus, "[a]n employee's contractual pension expectations are measured by benefits which are in effect not only when employment commences, but which are thereafter conferred during the employee's subsequent tenure." (*Id.* at p. 866.) Given these circumstances, " 'benefits conferred under a pension system by changes which are made from time to time prior to the adoption of an amendment imposing a detriment "have no bearing upon the reasonableness" of the detriment so imposed.' " (*Id.* at p. 867.) In making these determinations, the *Betts* court emphasized that "there is a strict limitation on the conditions which may modify the pension system in effect during employment." (*Id.* at pp. 863-864.)

After *Betts*, the high court considered vested pension rights again in *Allen v. Board of Administration* (1983) 34 Cal.3d 114 (*Allen II*), which involved an " 'historically unique' " set of facts related to constitutional revisions in 1966 that turned state legislators from essentially part-time employees making approximately $500 per month to full-time public servants with an annual salary of $16,000. Although pre-1967 retirees had been entitled to a fluctuating pension, the constitutional amendments expressly stated that such retirees could not use the new, substantially increased legislative salary when computing their retirement benefits. (*Id.* at pp. 117-118, 123.) The high court concluded

54

that these changes did not unconstitutionally impair the vested rights of the pre-1967 retirees under a federal contracts clause analysis because those retirees could not have reasonably expected "under the terms of their employment contract to obtain retirement allowances computed on the basis of the unique salary increase accomplished by the constitutional revision of 1966 which expressly negated such expectations." (*Id.* at pp. 119, 124-125.) In this way, *Allen II* underscores the notion that it is the employee's reasonable expectations during employment that should define the scope of his or her vested pension rights. In addition, *Allen II* clarified that the test for judging pension modifications is a balancing one, which requires the reconciliation of constitutionally protected contract rights against the " ' " ' essential attributes of sovereign power.' " ' " (*Id.* at p. 119.) Thus, "for example, '[m]inimal alteration of contractual obligations may end the inquiry at its first stage. Severe impairment, on the other hand, will push the inquiry to a careful examination of the nature and purpose of the state legislation.' " (*Ibid.*)

Thereafter, in *Legislature v. Eu* (1991) 54 Cal.3d 492, the Supreme Court elaborated that vested pension benefits include both the right to receive any such benefits upon retirement and the "collateral right to *earn* future pension benefits through continued service, on terms substantially equivalent" to those offered at the commencement of employment. (*Id.* at pp. 528-530.) Thus, a statewide proposition that purported to terminate the rights of incumbent state legislators to earn additional pension benefits through continued state service, where no comparable new advantage was offered, was found to be an impermissible modification of their vested pension rights. (*Ibid.*) Finally, *City of Huntington Beach v. Board of Administration* (1992) 4 Cal.4th 462 (*Huntington Beach*) involved the question of whether detention officers qualified for local safety member status under PERS. (*Id.* at p. 464.) The high court concluded that they did not and thereafter considered the argument that the affected employees might nevertheless have a vested right to such status under a prior statutory scheme. (*Id.* at pp. 471-472.) After reaching the same result under prior law, the high court rejected the

contract clause argument, opining that "the jailers in this case have no vested right in previous erroneous classifications by the PERS Board." (*Id*. at p. 472, fn. omitted.)

Before applying these teachings to the case at hand, we consider our colleagues recent vested rights discussion in *Marin*.

2. *Vested Rights Analysis in the Marin Case*.

As stated above, Division Two recently concluded that the changes to CERL's definition of compensation earnable effected by PEPRA did not amount to an unconstitutional impairment of the vested pension rights of the legacy members of Marin CERA. (*Marin*, *supra*, 2 Cal.App.5th at pp. 693-709.) Shortly after the Legislature enacted PEPRA, Marin CERA adopted a policy implementing the amendments to section 31461, similar to the policies promulgated by CCCERA, ACERA, and MCERA that are at issue in this case. (*Id.* at pp. 685-686.) In particular, the board determined that—for members retiring after January 1, 2013—numerous pay items previously included in compensation earnable would be excluded, and Marin CERA would no longer collect retirement contributions based on those items. (*Id.* at p. 686.) The new exclusions from pensionable compensation applied only to that portion of the retiring member's final compensation period that occurred on or after January 1, 2013, and included among the newly-impermissible benefits: standby, administrative response, and call back pay (whether overtime or otherwise); certain in-kind benefits converted to cash; terminal pay; and certain lump sum and bonus payments. (*Id.* at p. 687.)

In response to the board's actions, several individual employee members of Marin CERA, together with a number of affected employee organizations, brought suit challenging the retirement board's implementation of PEPRA—in particular, as in this case, its application to legacy members, those employees who were hired prior to January 1, 2013. (*Marin*, *supra*, 2 Cal.App.5th at pp. 679, 687, 689-690.) The complaint appears to have raised many of the same issues we have before us in this case, including whether AB 197 was declarative of existing law; whether wholesale exclusion of certain benefits under subdivision (b)(1) of section 31461 without a determination that they had been paid to enhance a member's pension was improper; and whether application to legacy

56

members of the changes to compensation earnable effected by AB 197 unconstitutionally impaired their vested rights. (*Marin*, *supra*, 2 Cal.App.5th at pp. 688, 691, fn. 14.) After the State intervened to defend the constitutionality of PEPRA, Marin CERA filed a general demurrer, claiming that the plaintiffs had failed to state a cause of action because AB 197 was constitutional and Marin CERA was required by law to implement it. (*Id.* at p. 689.)

The trial court ultimately granted Marin CERA's demurrer without leave to amend. (*Marin*, *supra*, 2 Cal.App.5th at p. 689.) "In its entirety, the trial court's order read: 'Respondents' Demurrer to the Verified Writ Petition is sustained without leave to amend. The court finds the Respondents' actions implementing Govt. Code § 31461, as amended effective January 1, 2013, are proper and that the Public Employees' Pension Reform Act of 2013 is constitutional. The Respondent Board of Retirement has the exclusive authority and responsibility to determine its members "compensation earnable," which is used to calculate members' retirement allowance, pursuant to Gov. Code § 31461. (See *Howard Jarvis Taxpayers' Ass'n. v. Bd. of Supervisors of Los Angeles County* (1996) 41 Cal.App.4th 1363, 1373, and *In re Retirement Cases*[*, supra,*] 110 Cal.App.4th 426, 453.) A statute, once duly enacted, is presumed to be constitutional. [¶] SO ORDERED.' " (*Marin, supra,* 2 Cal.App.5th at p. 690.)

In reviewing the trial court's demurrer decision, the *Marin* court eschewed analysis of the many issues of statutory construction with which we have wrestled here, instead conducting a purely constitutional inquiry into the vested rights implications of AB 197. (*Marin*, *supra*, 2 Cal.App.5th at pp. 690-693 & 691, fn. 14.) After detailing much of the same law with respect to vested pension rights that we have summarized above, the *Marin* court focused on the question of whether, to be reasonable, the elimination or reduction of an anticipated pension benefit *must* be counterbalanced by a comparable new advantage. (*Id.* at pp. 694-700.) In *Allen I*, the high court opined that for a pension modification to be sustained as reasonable, any detrimental change "*should* be accompanied by comparable new advantages." (*Allen I*, *supra*, 45 Cal.2d at p. 131, italics added.) Almost 30 years later, in *Allen II*, the Supreme Court changed the

formulation of its reasonableness test, holding that, although the vested pension rights of active employees may be modified to their detriment prior to retirement, any such change "*must* be accompanied by comparable new advantages." (*Allen II*, *supra*, 34 Cal.3d at p. 120, italics added.) After tracing the origin of the "must" language to a 1969 appellate court decision and establishing that it has never again been reiterated by the Supreme Court, *Marin* makes, we feel, a convincing argument that the use of "must" in *Allen II* was not "intended to herald a fundamental doctrinal shift." (*Marin*, *supra*, 2 Cal.App.5th at pp. 697-699.) Thus, according to *Marin*, the high court's vested rights jurisprudence generally requires only that detrimental pension modifications *should* (i.e., ought) to be accompanied by comparative new advantages—in effect, " 'a recommendation, not . . . a mandate.' " (*Id.* at p. 699.)

Applying this analysis to the facts before it, the *Marin* court had little difficulty concluding that the changes effected by AB 197 did not unconstitutionally impair the vested rights of Marin CERA's legacy members. (*Marin*, *supra*, 2 Cal.App.5th at pp. 700-709.) Returning repeatedly to the notion that a public employee is entitled only to a " 'reasonable' " pension (*id.* at pp. 702, 704, 706-707), the *Marin* court highlighted the language of *Allen II* quoted above that requires consideration of the " ' " 'essential attributes of sovereign power' " ' " when determining whether an impairment of vested rights is constitutionally permitted. (*Marin*, *supra*, 2 Cal.App.5th at p. 700; see also *id.* at p. 701 [" ' " 'not only is the existing law read into contracts in order to fix their obligations, but the reservation of the essential attributes of continuing governmental power is also read into contracts as a postulate of the legal order' " ' "].) Thereafter— without determining what the changes to section 31461 effected by PEPRA actually are—the court noted that they constitute "only one aspect" of how Marin CERA employee-members are compensated and are "quite modest." (*Marin*, *supra*, 2 Cal.App.5th at p. 704.) In contrast, the court described the catalyst for PEPRA as "dire financial predictions necessitating urgent and fundamental changes to improve the solvency of various pension systems, including CERL." (*Marin*, *supra*, 2 Cal.App.5th at pp. 704-705.) Indeed, the court spent significant time in its opinion detailing the severity

58

of the unfunded pension liability crisis at both the state and national level, and additionally cited evidence specific to Marin CERA suggesting that unfunded pension liability was a looming problem for that particular CERL system as well.[23] (*Id.* at pp. 680-687.) Balancing the amendments to section 31461 against the significance of the problem they were designed to address, the *Marin* court concluded that "[i]n light of the unquestionable need for change, . . . this one was reasonable." (*Marin*, *supra*, 2 Cal.App.5th at p. 706.)[24]

Much of *Marin*'s vested rights analysis—including its rejection of the absolute need for comparable new advantages when pension rights are eliminated or reduced—is not controversial, and we do not disagree with it. However, we must respectfully part

---

[23] For instance, in 2011, the Marin County Civil Grand Jury reported that " 'During the financial fiasco of 2008 and 2009, the Marin County Employees' Retirement Association's [Marin CERA's] net assets . . . declined by . . . 25.5% . . . due to investment losses. Employer pension costs have increased dramatically . . . . [¶] . . . Although it is tempting to suggest that the cause of the budget problem is high total employee compensation, that is not the acute problem. . . . . [T]he acute problem is unpredictable, rapid variation in compensation—caused at this time by increasing pension costs.' " (*Marin*, *supra*, 2 Cal.App.5th at p. 685, fn. 7.) By 2015, the grand jury opined that the granting of " 'pension enhancements . . . contributed to the increase of the unfunded pension liability of [Marin CERA]; this unfunded liability increased from a surplus of $26.5 million in 2000 to a deficit of $536.8 million in 2013. This increase . . . may place the future financial viability of the pension plans at significant risk.' " (*Id.* at p. 686, fn. 7.)

[24] Although its holding appears to be based on the reasoning summarized above, the *Marin* court also makes the relatively brief suggestion that PEPRA does, in fact, provide a new advantage to legacy members. (*Marin*, *supra*, 2 Cal.App.5th at pp. 699-700.) Specifically, the court posits, that—if Marin CERA members continue to receive the benefits excluded from compensation earnable from their employers without having to front any retirement contributions with respect to those monies—they will end up with more cash in hand every month, a new advantage. (*Ibid.*) We do not find this dicta particularly persuasive. As a fundamental matter, pension systems are premised on the assumption that it is more advantageous for employees to forego the current use of their total compensation in order to ensure a predictable and sufficient income stream after they retire. If this were not the case, we would likely not be here, faced with the need to resolve these knotty pension disagreements. Thus, while additional monthly income may be considered some sort of an advantage, it can hardly be described as comparable.

ways with our colleagues in Division Two when it comes to their application of the law to this specific dispute. Part of the problem may be the difference in procedural posture between our litigation and *Marin*'s. As the *Marin* court acknowledged, since its case never cleared the pleading stage, the court was "in effect deciding an odd hybrid—whether the Pension Reform Act is unconstitutional on its face as it applies to the claimed vested contractual rights of [Marin CERA] employees. That is a limited issue of legislative power considered in an undisputed factual context." (*Marin*, *supra*, 2 Cal.App.5th at p. 708.)

Nevertheless, we believe that the *Marin* court improperly relied on its general sense of what a reasonable pension might be, rather than acknowledging that the Supreme Court has expressly defined a reasonable pension as one which is subject only to *reasonable* modification. Thus, an employee's right to a reasonable pension can only be judged in the context of the balancing analysis established by *Allen I*. This error appears to have been compounded when, in considering the disadvantages imposed on legacy members by AB 197, the *Marin* court—once it determined that comparative new advantages must not absolutely be provided—too quickly dismissed what could amount to significant financial disadvantages to legacy members as "quite modest." (*Marin*, *supra*, 2 Cal.App.5th at p. 704.) In fact, as the *Marin* court, itself, acknowledged, should does not mean "don't have to." It means "really ought to." (See *id.* at p. 699.) Thus, when no comparative new advantages are given, the corresponding burden to justify any changes with respect to legacy members will be substantive. (See *Allen II*, *supra*, 34 Cal.3d at p. 119.)

Admittedly, total pension system collapse may be a sufficiently weighty concern to meet this standard. However, there is no indication in the *Marin* decision that, in considering the fiscal justification for application of the pension modifications at issue to legacy members, the court specifically weighed the financial implications for Marin CERA if legacy members were exempted from those modifications, rather than impermissibly focusing on the unfunded pension liability crisis in general. (Cf. *Abbott*, *supra*, 50 Cal.2d at pp. 445, 455 [rejecting as "speculation" a general argument that rising

60

costs might otherwise cause the pension system to cease to exist].)  In the end, we simply do not think that it is possible to engage in the individualized balancing test mandated by the Supreme Court's vested rights jurisprudence—and thereby determine whether it is reasonable to apply the pension modifications at issue to legacy members—without a specific analysis of the changes that have been effected by the new law; consideration of the impact of those changes on the legacy members at issue; and an evaluation of the legislative rationale for the change in the context of the facts of each specific CERL system.  We therefore decline to follow *Marin*.

   3. *Vested Rights in this Case*.

  We have concluded that AB 197 modified CERL and therefore potentially impacted the vested pension rights of legacy members in two distinct ways—by removing certain on-call and related payments from pensionable compensation and by allowing CERL boards to look to the intent behind particular items of compensation that would otherwise be deemed compensation earnable to determine whether they nevertheless constitute impermissible "enhancement" benefits.  Applying our view of the Supreme Court's vested rights jurisprudence as described above, we believe that the reasonableness of these PEPRA amendments must be judged independently in each of the Three Counties, so that the impact of applying the changes to legacy members can be evaluated in the context of each county's particular CERL system.  Although it implicitly found a vested rights violation with respect to on-call pay, the trial court below never conducted the systematic vested rights analysis needed.  Nor did it consider the impact of both detrimental changes we have identified.  Moreover, the parties have not had the opportunity to brief and argue these issues.  We are therefore without sufficient information to resolve these vested rights disputes on appeal and must remand the matter for further consideration in light of the guidance provided in this opinion.

  When considering whether the vested rights of legacy member in each of CCCERA, AECRA, and MECRA have been unconstitutionally impaired, the trial court should recognize that—since no corresponding new advantages have been provided with respect to the detrimental changes to compensation earnable effected by PEPRA—the

61

application of the detrimental changes to legacy members can only be justified by *compelling* evidence establishing that the required changes "bear a material relation to the theory . . . of a pension system," and its successful operation. (*Allen II*, *supra*, 34 Cal.3d at p. 120; see *Allen I*, *supra*, 45 Cal.2d at p. 131; see also *Wallace*, *supra*, 42 Cal.2d at p. 185.) Moreover, this analysis must focus on the impacts of the identified disadvantages on the specific legacy members at issue. (*Abbott*, *supra*, 50 Cal.2d at p. 449, 453.) And, if the justification for the changes is the financial stability of the specific CERL system, the analysis must consider whether the exemption of legacy members from the identified changes would cause that particular CERL system to have "difficulty meeting its pension obligations" with respect to those members. (*Allen I*, *supra*, 45 Cal.2d at p. 133.) In this regard, mere speculation is insufficient. (See *Abbott*, *supra*, 50 Cal.2d at pp. 445, 455.) Moreover, generally speaking "[r]ising costs alone will not excuse the city from meeting its contractual obligations, the consideration for which has already been received by it." (*Id.* at p. 455; see also *Ventura*, *supra*, 16 Cal.4th at p. 507 [noting, in requiring that pension benefits required by CERL be provided retroactively to Ventura pensioners, that "[n]othing in this record suggests that the burden on the county fisc justifies either perpetuation of an erroneous construction of the applicable statutes or denying these plaintiffs the benefit of our decision"].) Under this analysis, and contrary to the holding in *Marin*, the fact that the modifications here at issue may be relatively modest looking at a system's pension costs as a whole may actually argue in favor of finding an impairment, as the continuation of such benefits solely for legacy members may not have a significant impact on the system, especially if such benefits have been already actuarially accounted for and treated as pensionable.

## D. *Estoppel*

As a final matter, we must determine whether the trial court erred in concluding with respect to leave cash-outs that certain legacy members—while failing to prove impairment under a vested rights analysis—nevertheless are entitled to relief based on principles of equitable estoppel. Since we have opined that, even under AB 197, all leave cashed out during the final compensation period must be included in compensation

62

earnable, regardless of when the underlying leave accrued, we need not address the trial court's estoppel treatment of in-service leave-cash-outs. In contrast, we have confirmed that terminal pay was never pensionable under CERL. Thus, the application of estoppel to this type of compensation remains at issue. Below, the trial court generally refused to apply estoppel principles to permit continued treatment of terminal pay as compensation earnable for legacy members because it found that a member's expectation that such pay would be pensionable did not "rise to the level necessary to establish an 'injury' sufficient to bring the doctrine of equitable estoppel into play." With respect to Merced members only, however, the trial court made an exception because it was convinced that reliance on the litigated judgment in *Baker*—which interpreted the Merced Post-*Ventura* Settlement Agreement as including in compensation earnable up to 160 hours of terminal pay—was sufficient to trigger the application of equitable estoppel for those members. On appeal, the State and the Sanitation District contend that the trial court's estoppel determination is too broad, while appellants aver it is too narrow.

We recently had occasion to review the law relating to estoppel in the public pension context and summarized it as follows: "The doctrine of equitable estoppel is founded on notions of equity and fair dealing and provides that a person may not deny the existence of a state of facts if that person has intentionally led others to believe a particular circumstance to be true and to rely upon such belief to their detriment. [Citation.] ' "Generally speaking, four elements must be present in order to apply the doctrine of equitable estoppel: (1) the party to be estopped must be apprised of the facts; (2) he must intend that his conduct shall be acted upon, or must so act that the party asserting the estoppel had a right to believe it was so intended; (3) the other party must be ignorant of the true state of facts; and (4) he must rely upon the conduct to his injury." ' " (*City of Oakland v. Oakland Police & Fire Retirement System* (2014) 224 Cal.App.4th 210, 239 (*City of Oakland*).) "Where, as here, a party seeks to invoke the doctrine of equitable estoppel against a governmental entity, an additional element applies. That is, the government may not be bound by an equitable estoppel in the same manner as a private party unless, 'in the considered view of a court of equity, the injustice which

63

would result from a failure to uphold an estoppel is of sufficient dimension to justify any effect upon public interest or policy which would result from the raising of an estoppel.' " (*Id.* at p. 240; see *Long Beach v. Mansell* (1970) 3 Cal.3d 462, 496-497 (*Mansell*); *Driscoll v. City of Los Angeles* (1967) 67 Cal.2d 297, 306 ["doctrine of equitable estoppel may be applied against the government where justice and right require it"].)  Finally, as we acknowledged in *City of Oakland,* "there is a line of cases holding that estoppel cannot lie to contravene any statutory limitation on an agency's authority."  (*City of Oakland*, *supra*, 224 Cal.App.4th at pp. 243-244 [citing cases]; but see *Mansell*, *supra*, 3 Cal.3d at pp. 496-499 [declining to decide the issue but positing that this line of cases may be included within its general analysis and rule].)[25]

Both the State and the Sanitary District argue strenuously on appeal that the trial court's estoppel order was improper because CERL boards never had the authority to treat terminal pay as pensionable.  Thus, they claim, allowing the continued inclusion of terminal pay in compensation earnable for legacy members on estoppel grounds would impermissibly force a governmental agency to act outside of its statutory authority.  (See *Longshore v. County of Ventura* (1979) 25 Cal.3d 14, 28  (*Longshore*) [noting that "no court has expressly invoked principles of estoppel to contravene directly any statutory or constitutional limitations"]; *Medina*, *supra*, 112 Cal.App.4th at p. 870 ["estoppel is barred where the government agency to be estopped does not possess the authority to do what it appeared to be doing"].)  We are not convinced.

It is undeniably true, as we have discussed at length, that CERL boards do not have the power to include terminal pay in compensation earnable as a matter of discretion.  However, under both statutory and constitutional law, such boards have plenary authority with respect to the administration of their respective CERL systems. (§ 31520 ["the management of the retirement system is vested in the board of

---

[25] Where the underlying facts are undisputed, whether equitable estoppel applies is a question of law subject to our de novo review.  (*City of Oakland*, *supra*, 224 Cal.App.4th at p. 240.)  "Moreover, where the issues require a weighing of policy concerns, they too present a question of law."  (*Ibid*.)

retirement"]; Cal. Const., art. XVI, § 17 [retirement board of a public pension system has "plenary authority and fiduciary responsibility for investment of moneys and administration of the system"]; *id.*, § 17, subd. (a) [retirement board has "sole and exclusive responsibility to administer the system in a manner that will assure prompt delivery of benefits and related services to the participants and their beneficiaries"]; *id.*, § 17, subd. (b) [members of retirement board shall discharge their duties to, among other things, defray "reasonable expenses of administering the system"].)  Surely, this broad administrative mandate must include the power to settle litigation in order to defray legal expenses and ensure the prompt and certain delivery of benefits to their members.  And this was precisely the impetus behind the Post-*Ventura* Settlement Agreements in each of the Three Counties.

In the wake of *Ventura,* CERL boards were faced with a somewhat unprecedented situation, which included: a Supreme Court ruling greatly expanding the types of pay items that they had previously understood to be includable in compensation earnable; litigation by CERL members statewide, seeking to reap the benefits of the *Ventura* decision; the prospect of significant and ongoing costs of litigation; the lingering (albeit incorrect) notion that CERL boards possessed discretion under *Guelfi* to include additional pay items, over and above those mandated by *Ventura*, in compensation earnable; and the constitutional requirement that they promptly and efficiently deliver benefits to their members.  In light of these myriad factors, we believe the CERL boards acted within their statutory powers to settle the claims against them.  The critical distinction here is between a CERL board's ability, by contract, to create a vested pension right contrary to statute (they cannot as discussed above), and the power of that same board to settle a pension dispute in such a way that the board may be equitably estopped from denying the impacted employees the benefit of their bargain.  Under such circumstances, any pension amounts to be paid to members that were later determined to be in excess of specific statutory authority, would simply be costs of achieving certainty

in the administration of the system.  We therefore conclude that estoppel is not barred in this case based on a lack of statutory authority for the CERL boards to do what they did.[26]

Moreover, after weighing the interests at stake in this case, we conclude that "the injustice which would result from a failure to uphold an estoppel is of sufficient dimension to justify any effect upon public interest or policy which would result from the raising of an estoppel." (*Mansell, supra*, 3 Cal.3d at pp. 496–497.)  As we recognized in *City of Oakland*, "[c]ases which have applied the doctrine of equitable estoppel in the area of public employee pensions have emphasized the 'unique importance' of pension rights to the well-being of the holders of those rights." (*City of Oakland*, *supra*, 224 Cal.App.4th at p. 242.)  In *Longshore,* our high court elaborated:  "The cases which have applied estoppel to the narrow area of public employee pensions, have emphasized the unique importance of pension rights to an employee's well-being, and have frequently arisen after employees were induced to accept and maintain employment on the basis of expectations fostered by widespread, long-continuing misrepresentations by their employers.  In each of these instances the potential injustice to employees or their dependents clearly outweighed any adverse effects on established public policy." (*Longshore*, *supra*, 25 Cal.3d at p. 28.)  It is beyond doubt that this is a case in which there have been widespread and long-continuing misrepresentations by both employers

---

[26] In making this determination, we recognize that the Post-*Ventura* Settlement Agreement in Contra Costa County only applied to retirees and that CCCERA voluntarily extended its terms to active members by resolution.  Under the facts of this case, however, this appears to be a distinction without a difference.  In the post-*Ventura* climate, all impacted members, both active and retired, were litigating their entitlement to *Ventura* benefits.  Had CCCERA refused to apply the settlement terms to its active members, it would almost certainly have faced another lawsuit.  Thus, we deem the threat of litigation presented under these circumstances to be sufficient to bring active members within the purview of CCCERA's settlement power.  We additionally acknowledge that *Marin* appears to have reached the opposite conclusion with respect to the availability of estoppel on these facts.  However, it did so in the context of finding no abuse of discretion in the trial court's refusal to grant leave to amend to add an estoppel claim. (*Marin*, *supra*, 2 Cal.App.5th at pp. 708-709, fn. 24.)  Here, in contrast, we have had the benefit of full briefing on the estoppel argument by the parties, as well as a decision by the trial court reaching the merits of the issue.

66

and the Boards regarding the ability of legacy members to include terminal pay in pensionable compensation.

Arguments raised on the other side of this balancing analysis, in contrast, are not persuasive. The State and the Sanitary District, for instance, suggest that allowing the continued inclusion of terminal pay in compensation earnable for legacy members constitutes an impermissible gift of public funds. But public agencies are clearly allowed to expend settlement monies without running afoul of this constitutionally-enshrined public policy. (See Cal. Atty. Gen. No. 99-907, 83 Ops.Cal.Atty.Gen. 45, 46-47 (2000) [early retirement annuities offered in exchange for releases of employment-related claims which would allow for litigation expense savings not a gift of public funds].) The State additionally argues that "invoking estoppel would allow for the known and continued spiking of employee pensions, contravening the purpose of CERL." However, all new members will be governed by the restrictions on spiking imposed by AB 197, and we are not convinced that this "anti-spiking" intent was evident in CERL prior to PEPRA. Rather, we think the legislative history before the enactment of AB 197 more reasonably evinces a "long-standing practice of the Legislature of not intruding into the county decisionmaking process regarding compensation determinations with respect to [CERL] retirement systems." (Stats. 1992, ch. 45, § 3(4).) In addition, the terminal pay authorized in the Three Counties by the Post-*Ventura* Settlement Agreements is fairly circumscribed. As stated above, any such terminal pay for CCCERA and ACERA legacy members is limited to the amount of leave accrued in the final compensation period, while MCERA's terminal benefit is limited to 160 hours. Further, these benefits have reportedly been recognized and actuarially accounted for by all three CERL systems. We therefore conclude that the equities in this case tip decidedly in favor of allowing an estoppel claim to proceed.

Finally, with respect to the specific elements needed to support equitable estoppel, the Sanitary District argues that these requirements have not been proven on an individual basis by each legacy member as required, while the State focuses on an alleged lack of justifiable reliance by legacy members based on the Board's promises.

67

Appellants dispute these claims, and additionally argue that the trial court erred by selectively applying estoppel to only certain legacy members, due to a too-narrow view of the injury required under the estoppel doctrine. Again, we believe that appellants have the stronger argument. Legacy members in all Three Counties entered into and remained in employment based, at least in part, on the promise that they would receive a pension as authorized by CERL. (*In re Retirement Cases*, *supra*, 110 Cal.App.4th at pp. 453-454 [when members entered into employment contracts they "agreed to have their 'compensation earnable' and 'final compensation' calculated pursuant to CERL"]; see also *Kern*, *supra*, 29 Cal.2d at p. 856 [stating that "one of the primary objectives in providing pensions for government employees . . . is to induce competent persons to enter and remain in public employment"].) For many years, through their court-approved *Post-Ventura* Settlement Agreements, the Boards in each of the Three Counties made precise and explicit promises to these legacy members as to what such a statutorily authorized CERL pension would include. (See *West v. Hunt Foods, Inc.* (1951) 101 Cal.App.2d 597, 604-605 [noting in the context of a definite and precise promise that " '[a] promise which the promisor should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise' "].) Presumably and reasonably, all legacy members organized their work lives accordingly. Thus, while the Boards may ultimately have been proven incorrect with respect to the pensionability of terminal pay, such that a vested rights analysis is not appropriate, we believe that their actions in this case were sufficient to establish the necessary elements of estoppel for all impacted legacy members. [27] Thus, unlike the trial

---

[27] In this regard, we note that " '[t]he fact that the advice may have been given in good faith does not preclude the application of estoppel. Good faith conduct of a public officer or employee does not excuse inaccurate information negligently given. [Citations.] In a matter as important to the welfare of a public employee as his pension rights, the employing public agency ' "bears a more stringent duty" ' to desist from giving misleading advice. [Citation.]' " (*City of Oakland*, *supra*, 224 Cal.App.4th at p. 241,

court, we see no meaningful difference between MCERA and the other two Boards based on the existence of the *Baker* judgment. Nor do we believe that estoppel in this case should be limited to those legacy employees who had accumulated a certain amount of banked leave by a particular date. Rather, all legacy members should be entitled to include terminal pay in compensation earnable to the limited extent such pay was designated as pensionable by their relevant Post-*Ventura* Settlement Agreement.

### III. DISPOSITION

The Judgments are affirmed in part and reversed in part, the related Writs are vacated to the extent inconsistent with this decision, and the matter is remanded for determinations, in accordance with the analysis set forth herein, as to the reasonableness of PEPRA's detrimental changes when applied to the vested rights of legacy members in each of CCCERA, ACERA, and MCERA. Each party to bear its own costs.

---

quoting *Crumpler v. Board of Administration* (1973) 32 Cal.App.3d 567, 582 (*Crumpler*); see also *Mansell, supra,* 3 Cal.3d 462, 491 ["[e]specially in cases where the party to be estopped has made affirmative representations . . . knowledge of the true facts will be imputed to one who, in the circumstances of the case, ought to have such knowledge"].) Moreover, whether the Boards' representations with respect to terminal pay are characterized as statements of fact or law is not dispositive. (*City of Oakland*, *supra*, 224 Cal.App.4th at pp. 240-241, fn. 15.) Rather, where, as here, a confidential relationship exists among the parties, estoppel can be applied based on the representations made, and advice given, to legacy members regarding their substantive rights. (*Ibid.* [collecting cases].) "Under such circumstances, the court considers a variety of factors focused on the culpability of the public agency and the impact of the advice on the claimant, including (1) whether the advice was negligent at the time it was made; (2) whether the agency acted in bad faith; (3) whether the agency purported to 'advise and direct' the claimant rather than merely 'inform and respond'; (4) whether the agency acted with certitude in dispensing the advice; (5) whether a confidential relationship exists; (6) whether the right asserted was one of 'great magnitude'; and (7) whether the claimant purports to have no knowledge or training while the agency purports to be informed and knowledgeable. [Citation.] Any one of these factors can be determinative under the facts of a particular case. [Citation.]" (*City of Oakland*, *supra*, 224 Cal.App.4th at p. 240, fn. 15, citing *Driscoll, supra,* 67 Cal.2d at pp. 306-311.)

69

_____

REARDON, J.


We concur:


_____

RUVOLO, P. J.


_____

RIVERA, J.

Trial Court:                        Contra Costa County Superior Court


Trial Judge:                        Hon. David B. Flinn


Counsel for Appellant:              Isaac S. Stevens
                                    Mastagni, Holstedt, Amick, Miller & Associates

                                    Timothy K. Talbot
                                    Rockne A. Lucia
                                    Rains, Lucia & Willinson

                                    W. David Holsberry
                                    Holsberry, Stemerman & Holsberry

Counsel for Respondent:             Harvey L. Leiderman
                                    Reed Smith

                                    Rei Onishi

                                    Ashley K. Dunning
                                    Nossaman

                                    Robert L. Gaumer
                                    Alameda City Employees' Retirement Association


Counsel for Intervenor:             Anne I. Yen
                                    Vincent A. Harrington, Jr.
                                    Weinberg, Roger & Rosenfeld

                                    Peter W. Saltzman
                                    Leonard Carder LLP

                                    Vishtasp Soroushian
                                    Andrew H. Baker
                                    Teague P. Paterson
                                    Beeson, Tayer & Bodine

Robert Bonsall
Beeson, Tayer, Silbert & Bodine

Katwyn T. DeLaRosa
Bennett & Sharpe, Inc.

William I. Corman
Bogatin, Corman & Gold

Christopher E. Platten
Wylie, McBride, Platten & Renner

Paul Q. Goyette
Goyette &Associates

Arthur W. Liou
Leonard Carder

Robert J. Bezemek

Wright Lassiter, III

Mark Friedman

Brian E. Washington

Michael E. Kyle
Randick, O'Dea & Tooliatos

Rod A. Attebery
Neumiller & Beardslee

Richard D. PioRoda
Kenton Alm
Meyers, Nave, Riback, Silver & Wilson

James D. Maynard
Maynard Law

David J. Larsen
Silver & Wright

Thomas L. Geiger
Contra Costa County Counsel

Lyle R. Nishimi
Judicial Council of California

Marie D. Hanson
Hanson Bridgett

Barbara Fee

Carl P. Nelson
Bold, Polisner, Maddow, Nelson & Judson

Robert Leete

William D. Ross

Craig Downs

Martin T. Snyder
Snyder, Cornelius & Hunter

Sue Casey

Barry J. Bennett
Bennett, Sharpe, Delarosa, Bennett & Licalsi


Counsel for Intervenor
and Respondent

Anthony P. O'Brien
Office of the Attorney General

73